# REPUBLIC NATIONAL BANK OF MIAMI *v.* UNITED STATES

No. 91–767. Argued October 5, 1992—Decided December 14, 1992

JUSTICE BLACKMUN delivered the opinion of the Court with respect to Parts I, II, and IV, concluding that, in an *in rem* forfeiture action, the Court of Appeals is not divested of jurisdiction by the prevailing party's transfer of the res from the district. The "settled" rule on which the Government relies—that jurisdiction over such a proceeding depends upon continued control of the res—does not exist. Rather, the applicable general principle is that jurisdiction, once vested, is not divested by a discontinuance of possession, although exceptions may exist where, for example, release of the res would render the judgment "useless" because the res could neither be delivered to the complainant nor restored to the claimant. See, *e. g., United States* v. *The Little Charles,* 26 F. Cas. 979. *The Brig Ann,* 9 Cranch 289, 290, distinguished. The fictions of *in rem* forfeiture were developed primarily to expand the reach of the courts and to furnish remedies for aggrieved parties, not to provide a prevailing party with a means of defeating its adversary's claim for redress. Pp. 84–89, 92–93.

THE CHIEF JUSTICE delivered the opinion of the Court in part, concluding that a judgment for petitioner in the underlying forfeiture action would not be rendered "useless" by the absence of a specific congressional appropriation authorizing the payment of funds to petitioner. Even if there exist circumstances where funds which have been deposited into the Treasury may be returned absent an appropriation, but cf. *Knote* v. *United States*, 95 U. S. 149, 154, it is unnecessary to plow that uncharted ground here. For together, 31 U. S. C. § 1304—the general appropriation for the payment of judgments against the United States— and 28 U. S. C. § 2465—requiring the return of seized property upon entry of judgment for claimants in forfeiture proceedings—would authorize the return of funds in this case in the event petitioner were to prevail below. See *Office of Personnel Management* v. *Richmond*, 496 U. S. 414, 432. Pp. 93–96.

BLACKMUN, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and IV, in which REHNQUIST, C. J., and WHITE, STEVENS, O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined, and an opinion with respect to Part III, in which STEVENS and O'CONNOR, JJ., joined. REHNQUIST, C. J., delivered the opinion of the Court in part, as to which WHITE, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined, and an opinion concurring in part and concurring in the judgment, in which WHITE, SCALIA, KENNEDY, and SOUTER, JJ., joined, *post*, p. 93. WHITE, J., filed a concurring opinion, *post*, p. 96. STEVENS, J., *post*, p. 99, and THOMAS, J., *post*, p. 99, filed opinions concurring in part and concurring in the judgment.

*Stanley A. Beiley* argued the cause for petitioner. With him on the briefs were *Robert M. Sondak* and *David S. Garbett*.

*Robert A. Long, Jr.*, argued the cause for the United States. With him on the brief were *Solicitor General Starr, Assistant Attorney General Mueller, Deputy Solicitor General Roberts*, and *Joseph Douglas Wilson*.

JUSTICE BLACKMUN announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and IV, and an opinion with respect to Part III.*

The issue in this case is whether the Court of Appeals may continue to exercise jurisdiction in an *in rem* civil forfeiture

---

*JUSTICE STEVENS and JUSTICE O'CONNOR join this opinion in its entirety.

proceeding after the res, then in the form of cash, is removed by the United States Marshal from the judicial district and deposited in the United States Treasury.

## I

In February 1988, the Government instituted an action in the United States District Court for the Southern District of Florida seeking forfeiture of a specified single-family residence in Coral Gables. The complaint alleged that Indalecio Iglesias was the true owner of the property; that he had purchased it with proceeds of narcotics trafficking; and that the property was subject to forfeiture to the United States pursuant to § 511(a)(6) of the Comprehensive Drug Abuse Prevention and Control Act of 1970, as amended, 92 Stat. 3777, 21 U. S. C. § 881(a)(6).[1] A warrant for the arrest of the property was issued, and the United States Marshal seized it.

In response to the complaint, Thule Holding Corporation, a Panama corporation, filed a claim asserting that it was the owner of the res in question. Petitioner Republic National Bank of Miami (Bank) filed a claim asserting a lien interest of $800,000 in the property under a mortgage recorded in 1987. Thule subsequently withdrew its claim. At the request of the Government, petitioner Bank agreed to a sale

---

[1] Title 21 U. S. C. § 881(a) reads in pertinent part:

"The following shall be subject to forfeiture to the United States and no property right shall exist in them:

"(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner."

of the property. With court approval, the residence was sold for $1,050,000. The sale proceeds were retained by the marshal pending disposition of the case. See App. 6, n. 2.

After a trial on the merits, the District Court entered judgment denying the Bank's claim with prejudice and forfeiting the sale proceeds to the United States pursuant to § 881(a)(6). *Id.*, at 25. The court found probable cause to believe that Iglesias had purchased the property and completed the construction of the residence thereon with drug profits. It went on to reject the Bank's innocent-owner defense to forfeiture. *United States* v. *One Single Family Residence Located at 6960 Miraflores Avenue, Coral Gables, Florida,* 731 F. Supp. 1563 (SD Fla. 1990).[2] Petitioner Bank filed a timely notice of appeal, but did not post a supersedeas bond or seek to stay the execution of the judgment.

Thereafter, at the request of the Government, the United States Marshal transferred the proceeds of the sale to the Assets Forfeiture Fund of the United States Treasury. The Government then moved to dismiss the appeal for want of jurisdiction. App. 4.

The Court of Appeals granted the motion. 932 F. 2d 1433 (CA11 1991). Relying on its 6-to-5 en banc decision in *United States* v. *One Lear Jet Aircraft, Serial No. 35A–280, Registration No. YN–BVO,* 836 F. 2d 1571, cert. denied, 487 U. S. 1204 (1988), the court held that the removal of the proceeds of the sale of the residence terminated the District Court's *in rem* jurisdiction. 932 F. 2d, at 1435–1436. The court also rejected petitioner Bank's argument that the District Court had personal jurisdiction because the Government had served petitioner with the complaint of forfeiture. *Id.*, at 1436–1437. Finally, the court ruled that the Govern-

---

[2] The Government also had argued that the "relation-back" doctrine precluded the Bank from raising an innocent-owner defense. See 731 F. Supp., at 1567. That issue is pending before this Court in No. 91–781, *United States* v. *A Parcel of Land, Rumson, N. J.,* argued October 13, 1992.

ment was not estopped from contesting the jurisdiction of the Court of Appeals because of its agreement that the United States Marshal would retain the sale proceeds pending order of the District Court. *Id.*, at 1437.

In view of inconsistency and apparent uncertainty among the Courts of Appeals,[3] we granted certiorari. 502 U.S. 1090 (1992).

## II

A civil forfeiture proceeding under §881 is an action *in rem*, "which shall conform as near as may be to proceedings in admiralty." 28 U.S.C. §2461(b). In arguing that the transfer of the res from the judicial district deprived the Court of Appeals of jurisdiction, the Government relies on what it describes as a settled admiralty principle: that jurisdiction over an *in rem* forfeiture proceeding depends upon continued control of the res. We, however, find no such established rule in our cases. Certainly, it long has been understood that a valid seizure of the res is a prerequisite to the *initiation* of an *in rem* civil forfeiture proceeding. *United States* v. *One Assortment of 89 Firearms*, 465 U.S. 354, 363 (1984); *Taylor* v. *Carryl*, 20 How. 583, 599 (1858); 1 S. Friedell, Benedict on Admiralty §222, p. 14–39 (7th ed. 1992); H. Hawes, The Law Relating to the Subject of Jurisdiction of Courts §92 (1886). See also Supplemental Rules for Certain Admiralty and Maritime Claims C(2) and C(3).

---

[3] Compare *United States* v. *One Lot of $25,721.00 in Currency*, 938 F. 2d 1417 (CA1 1991); *United States* v. *Aiello*, 912 F. 2d 4 (CA2 1990), cert. denied, 498 U.S. 1048 (1991); *United States* v. *$95,945.18, United States Currency*, 913 F. 2d 1106 (CA4 1990), with *United States* v. *Cadillac Sedan Deville, 1983*, 933 F. 2d 1010 (CA6 1991) (appeal dism'd); *United States* v. *Tit's Cocktail Lounge*, 873 F. 2d 141 (CA7 1989); *United States* v. *$29,959.00 U.S. Currency*, 931 F. 2d 549 (CA9 1991); and the Court of Appeals' opinion in the present case. Compare also *United States* v. *$57,480.05 United States Currency and Other Coins*, 722 F. 2d 1457 (CA9 1984), with *United States* v. *Aiello*, 912 F. 2d, at 7, and *United States* v. *$95,945.18, United States Currency*, 913 F. 2d, at 1110, n. 4.

The bulk of the Government's cases stands merely for this unexceptionable proposition, which comports with the fact that, in admiralty, the "seizure of the RES, and the publication of the monition or invitation to appear, is regarded as equivalent to the particular service of process in the courts of law and equity." *Taylor* v. *Carryl*, 20 How., at 599.

To the extent that there actually is a discernible rule on the need for continued presence of the res, we find it expressed in cases such as *The Rio Grande*, 23 Wall. 458 (1875), and *United States* v. *The Little Charles*, 26 F. Cas. 979 (No. 15,612) (CC Va. 1818). In the latter case, Chief Justice Marshall, sitting as Circuit Justice, explained that "continuance of possession" was not necessary to maintain jurisdiction over an *in rem* forfeiture action, citing the "general principle, that jurisdiction, once vested, is not divested, although a state of things should arrive in which original jurisdiction could not be exercised." *Id.*, at 982. The Chief Justice noted that in some cases there might be an exception to the rule, where the release of the property would render the judgment "useless" because "the thing could neither be delivered to the libellants, nor restored to the claimants." *Ibid.* He explained, however, that this exception "will not apply to any case where the judgment will have any effect whatever." *Ibid.* Similarly, in *The Rio Grande,* this Court held that improper release of a ship by a marshal did not divest the Circuit Court of jurisdiction. "We do not understand the law to be that an actual and continuous possession of the *res* is required to sustain the jurisdiction of the court. When the vessel was seized by the order of the court and brought within its control the jurisdiction was complete." 23 Wall., at 463. The Court there emphasized the impropriety of the ship's release. The Government now suggests that the case merely announced an "injustice" exception to the requirement of continuous control. But the question is

one of jurisdiction, and we do not see why the means of the res' removal should make a difference.[4]

Only once, in *The Brig Ann,* 9 Cranch 289, 290 (1815), has this Court found that events subsequent to the initial seizure destroyed jurisdiction in an *in rem* forfeiture action. In that case, a brig was seized in Long Island Sound and brought into the port of New Haven, where the collector took possession of it as forfeited to the United States. Several days later, the collector gave written orders for the release of the brig and its cargo from the seizure. Before the ship could leave, however, the District Court issued an information, and the brig and cargo were taken by the marshal into his possession. This Court held that, because the attachment was voluntarily released before the libel was filed and allowed, the District Court had no jurisdiction. Writing for the Court, Justice Story explained that judicial cognizance of a forfeiture *in rem* requires

> "a good subsisting seizure *at the time when the libel or information is filed and allowed.* If a seizure be completely and explicitly abandoned, and the property restored by the voluntary act of the party who has made

---

[4] See also *The Bolina,* 3 F. Cas. 811, 813–814 (No. 1,608) (CC Mass. 1812) (Story, J., as Circuit Justice) ("[O]nce a vessel is libelled, then she is considered as in the custody of the law, and at the disposal of the court, and monitions may be issued to persons having the actual custody, to obey the injunctions of the court.... The district court of the United States derives its jurisdiction, not from any supposed possession of its officers, but from the act and place of seizure for the forfeiture.... And when once it has acquired a regular jurisdiction, I do not perceive how any subsequent irregularity would avoid it. It may render the ultimate decree ineffectual in certain events, but the regular results of the adjudication must remain"); 1 J. Wells, A Treatise on the Jurisdiction of Courts 275 (1880) (An actual or constructive seizure provides jurisdiction in an admiralty forfeiture action. "And, having once acquired regular jurisdiction, no subsequent irregularity can defeat it; or accident, as, for example, an accidental fire").

the seizure, all rights under it are gone. Although judicial jurisdiction once attached, it is divested by the subsequent proceedings; and it can be revived only by a new seizure. It is, in this respect, like a case of capture, which, although well made, gives no authority to the prize Court to proceed to adjudication, if it be voluntarily abandoned *before judicial proceedings are instituted.*" *Id.,* at 291 (emphasis added).

Fairly read, *The Brig Ann* simply restates the rule that the court must have actual or constructive control of the res when an *in rem* forfeiture suit is initiated. If the seizing party abandons the attachment prior to filing an action, it, in effect, has renounced its claim. The result is "to purge away all the prior rights acquired by the seizure," *ibid.,* and, unless a new seizure is made, the case may not commence. *The Brig Ann* stands for nothing more than this.

The rule invoked by the Government thus does not exist, and we see no reason why it should. The fictions of *in rem* forfeiture were developed primarily to expand the reach of the courts and to furnish remedies for aggrieved parties, see *Continental Grain Co.* v. *Barge FBL–585,* 364 U. S. 19, 23 (1960); *Harmony* v. *United States,* 2 How. 210, 233 (1844), not to provide a prevailing party with a means of defeating its adversary's claim for redress. Of course, if a "defendant ship stealthily absconds from port and leaves the plaintiff with no *res* from which to collect," *One Lear Jet,* 836 F. 2d, at 1579 (Vance, J., dissenting), a court might determine that a judgment would be "useless." Cf. *The Little Charles,* 26 F. Cas., at 982. So, too, if the plaintiff abandons a seizure, a court will not proceed to adjudicate the case. These exceptions, however, are closely related to the traditional, theoretical concerns of jurisdiction: enforceability of judgments and fairness of notice to parties. See 1 R. Casad, Jurisdiction in Civil Actions § 1.02, pp. 1–13 to 1–14 (2d ed. 1991); cf. *Miller* v. *United States,* 11 Wall. 268, 294–295 (1871) ("Confessedly

the object of the writ was to bring the property under the control of the court and keep it there, as well as to give notice to the world. These objects would have been fully accomplished if its direction had been nothing more than to hold the property subject to the order of the court, and to give notice"). Neither interest depends absolutely upon the continuous presence of the res in the district.

Stasis is not a general prerequisite to the maintenance of jurisdiction. Jurisdiction over the person survives a change in circumstances, *Leman* v. *Krentler-Arnold Hinge Last Co.*, 284 U. S. 448, 454 (1932) ("[A]fter a final decree a party cannot defeat the jurisdiction of the appellate tribunal by removing from the jurisdiction, as the proceedings on appeal are part of the cause," citing *Nations* v. *Johnson*, 24 How. 195 (1861)), as does jurisdiction over the subject matter, *Louisville, N. A. & C. R. Co.* v. *Louisville Trust Co.*, 174 U. S. 552, 566 (1899) (midsuit change in the citizenship of a party does not destroy diversity jurisdiction); *St. Paul Mercury Indemnity Co.* v. *Red Cab Co.*, 303 U. S. 283, 289–290 (1938) (jurisdiction survives reduction of amount in controversy). Nothing in the nature of *in rem* jurisdiction suggests a reason to treat it differently.

If the conjured rule were genuine, we would have to decide whether it had outlived its usefulness, and whether, in any event, it could ever be used by a plaintiff—the instigator of the *in rem* action—to contest the appellate court's jurisdiction. The rule's illusory nature obviates the need for such inquiries, however, and a lack of justification undermines any argument for its creation. We agree with the late Judge Vance's remark in *One Lear Jet*, 836 F. 2d, at 1577: "Although in some circumstances the law may require courts to depart from what seems to be fairness and common sense, such a departure in this case is unjustified and unsupported by the law of forfeiture and admiralty." We have no cause to override common sense and fairness here. We hold that, in an *in rem* forfeiture action, the Court of Appeals is not

divested of jurisdiction by the prevailing party's transfer of the res from the district.[5]

### III

The Government contends, however, that this res no longer can be reached, because, having been deposited in the United States Treasury, it may be released only by congressional appropriation. If so, the case is moot, or, viewed another way, it falls into the "useless judgment" exception noted above, to appellate *in rem* jurisdiction.

The Appropriations Clause, U. S. Const., Art. I, § 9, cl. 7, provides: "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." In *Knote* v. *United States*, 95 U. S. 149 (1877), this Court held that the President could not order the Treasury to repay the proceeds from the sale of property forfeited by a convicted traitor who had been pardoned. But the Government—implicitly in its brief and explicitly at oral argument, see Tr. of Oral Arg. 37–39—now goes further, maintaining that, absent an appropriation, *any* funds that find their way into a Treasury account must remain there, regardless of their origin or ownership. Such a rule would lead to seemingly bizarre results. The Ninth Circuit recently observed: "If, for example, an

---

[5] We note that on October 28, 1992, the President signed the Housing and Community Development Act of 1992, 106 Stat. 3672. Section 1521 of that Act (part of Title XV, entitled the Annunzio-Wylie Anti-Money Laundering Act) significantly amended 28 U. S. C. § 1355 to provide, among other things:

"In any case in which a final order disposing of property in a civil forfeiture action or proceeding is appealed, removal of the property by the prevailing party shall not deprive the court of jurisdiction. Upon motion of the appealing party, the district court or the court of appeals shall issue any order necessary to preserve the right of the appealing party to the full value of the property at issue, including a stay of the judgment of the district court pending appeal or requiring the prevailing party to post an appeal bond." 106 Stat. 4062–4063.

Needless to say, we do not now interpret that statute or determine the issue of its retroactive application to the present case.

agent of the United States had scooped up the cash in dispute and, without waiting for a judicial order, had run to the nearest outpost of the Treasury and deposited the money . . . it would be absurd to say that only an act of Congress could restore the purloined cash to the court." *United States* v. *Ten Thousand Dollars ($10,000.00) in United States Currency,* 860 F. 2d 1511, 1514 (1988). Yet that absurdity appears to be the logical consequence of the Government's position.

Perhaps it is not so absurd. In some instances where a private party pays money to a federal agency and is later deemed entitled to a refund, an appropriation has been assumed to be necessary to obtain the money. See 55 Comp. Gen. 625 (1976); United States General Accounting Office, Principles of Federal Appropriations Law 5–80 to 5–81 (1982). Congress, therefore, has passed a permanent indefinite appropriation for " 'Refund of Moneys Erroneously Received and Covered' and other collections erroneously deposited that are not properly chargeable to another appropriation." 31 U. S. C. § 1322(b)(2). This appropriation has been interpreted to authorize, for example, the refund of charges assessed to investment advisers by the Securities and Exchange Commission and deposited in the Treasury, after those charges were held to be erroneous in light of decisions of this Court. See 55 Comp. Gen. 243 (1975); see also *National Presto Industries, Inc.* v. *United States,* 219 Ct. Cl. 626, 630 (1979) (suggesting that prior version of § 1322(b)(2) authorized refund of sum deposited in Treasury during litigation). Section 1322(b)(2) arguably applies here.

Petitioner offers a different suggestion. It identifies 28 U. S. C. § 2465 as an appropriation. That statute states: "Upon the entry of judgment for the claimant in any proceeding to condemn or forfeit property seized under any Act of Congress, such property shall be returned forthwith to the claimant or his agent." That is hardly standard language of appropriation. Cf. 31 U. S. C. § 1301(d). Yet I have diffi-

culty imagining how an "appropriation" of funds determined on appeal not to belong to the United States could ever be more specific.[6]

In part for that reason, however, I believe that a formal appropriation is not required in these circumstances. The Appropriations Clause governs only the disposition of money that belongs to the United States. The Clause "assure[s] that *public funds* will be spent according to the letter of the difficult judgments reached by Congress." *Office of Personnel Management* v. *Richmond,* 496 U. S. 414, 428 (1990) (emphasis added); see also Stith, Congress' Power of the Purse, 97 Yale L. J. 1343, 1358, and n. 67 (1988) (Clause encompasses only funds that belong to the United States); 2 Story, Commentaries on the Constitution of the United States § 1348 (3d ed. 1858) (object of the Clause "is to secure regularity, punctuality, and fidelity, in the disbursements of the *public money*" (emphasis added)). I do not believe that funds held

---

[6] THE CHIEF JUSTICE, writing for the Court on this question, *post,* p. 93, would find an appropriation in the judgment fund, 31 U. S. C. § 1304. While plausible, his analysis is nevertheless problematic. The judgment fund is understood to apply to money judgments only. See, *e. g.,* 58 Comp. Gen. 311 (1979). A final judgment in petitioner's favor, however, would be in the nature of a financial "acquittal"—a simple ruling that the res is not forfeitable. Unless we were to require the bank to sue on its judgment of nonforfeitability for return of a sum equivalent to the retained res, THE CHIEF JUSTICE's approach would seem to open the judgment fund to payment on nonmoney judgments. Moreover, as THE CHIEF JUSTICE acknowledges, see *post,* at 96, "the property subject to forfeiture in this case has been converted to proceeds now resting in the Assets Forfeiture Fund of the Treasury." Title 28 U. S. C. § 2465 can "be construed as authorizing the return of proceeds in such a case." *Post,* at 96. But a payment from the judgment fund would not achieve that purpose. The res is not in the judgment fund. A payment from that account, while no doubt entirely acceptable to petitioner, would not be a return of the forfeited property, and at the end of the episode (although I have no doubt that the Comptroller would manage to balance the books) the Assets Forfeiture Fund would be some $800,000 richer, and the judgment fund correspondingly diminished.

in the Treasury during the course of an ongoing *in rem* forfeiture proceeding—the purpose of which, after all, is to determine the ownership of the res, see, *e. g., The Propeller Commerce,* 1 Black 574, 580–581 (1862); *The Maggie Hammond,* 9 Wall. 435, 456 (1870); *Jennings* v. *Carson,* 4 Cranch 2, 23 (1807)—can properly be considered public money. The Court in *Tyler* v. *Defrees,* 11 Wall. 331, 349 (1871), explained that once a valid seizure of forfeitable property has occurred and the court has notice of the fact, "[n]o change of the title or possession [can] be made, pending the judicial proceedings, which would defeat the final decree."

Contrary to the Government's broad submission here, the Comptroller General long has assumed that, in certain situations, an erroneous deposit of funds into a Treasury account can be corrected without a specific appropriation. See 53 Comp. Gen. 580 (1974); 45 Comp. Gen. 724 (1966); 3 Comp. Gen. 762 (1924); 12 Comp. Dec. 733, 735 (1906); Principles of Federal Appropriations Law, at 5–79 to 5–81. Most of these cases have arisen where money intended for one account was accidentally deposited in another. It would be unrealistic, for example, to require congressional authorization before a data processor who misplaces a decimal point can "undo" an inaccurate transfer of Treasury funds. The Government's absolutist view of the scope of the Appropriations Clause is inconsistent with these commonsense understandings.

I would hold that the Constitution does not forbid the return without an appropriation of funds held in the Treasury during the course of an *in rem* forfeiture proceeding to the party determined to be their owner. Because the funds therefore could be disgorged if petitioner is adjudged to be their rightful owner, a judgment in petitioner's favor would not be "useless."

IV

In a civil forfeiture proceeding, where the Government has the power to confiscate private property on a showing of mere probable cause, the right to appeal is a crucial safe-

guard against abuse. No settled rule requires continuous control of the res for appellate jurisdiction in an *in rem* forfeiture proceeding. Nor does the Appropriations Clause place the money out of reach. Accordingly, we hold that the Court of Appeals did not lose jurisdiction when the funds were transferred from the Southern District of Florida to the Assets Forfeiture Fund of the United States Treasury. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court in part, concurred in part, and concurred in the judgment.*

I join the Court's judgment and Parts I, II, and IV of its opinion. I write separately, however, because I do not agree with the Appropriations Clause analysis set forth in Part III. JUSTICE BLACKMUN "would hold that the Constitution does not forbid the return without an appropriation of funds held in the Treasury during the course of an *in rem* forfeiture proceeding to the party determined to be their owner." *Ante*, at 92. JUSTICE BLACKMUN reaches this result because he concludes that funds deposited in the Treasury in the course of a proceeding to determine their ownership are not "public money." I have difficulty accepting the proposition that funds which have been deposited into the Treasury are not public money, regardless of whether the Government's ownership of those funds is disputed. Part of my difficulty stems from the lack of any support in our cases for this theory.

---

*JUSTICE WHITE, JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE SOUTER join THE CHIEF JUSTICE's opinion in its entirety. JUSTICE THOMAS joins this opinion only insofar as it disposes of the Appropriations Clause issue.

In *Knote* v. *United States*, 95 U. S. 149, 154 (1877), we stated: "[I]f the proceeds have been paid into the treasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress. Moneys once in the treasury can only be withdrawn by an appropriation by law." *Knote* is distinguishable in that the forfeiture proceeding in that case was final at the time the appropriations question arose. But the principle that once funds are deposited into the Treasury, they become public money—and thus may only be paid out pursuant to a statutory appropriation— would seem to transcend the facts of *Knote*. That there exists a specific appropriation for " 'Refund of Moneys Erroneously Received and Covered' and other collections erroneously deposited that are not properly chargeable to another appropriation," 31 U. S. C. § 1322(b)(2), supports this understanding.*

JUSTICE BLACKMUN relies principally on language from *Tyler* v. *Defrees*, 11 Wall. 331, 349 (1871), to the effect that once a seizure of forfeitable property has occurred, "[n]o change of the title or possession [can] be made, pending the judicial proceedings, which would defeat the final decree." See *ante*, at 92. This language is dictum rendered in the course of deciding a dispute over the sufficiency of the marshal's seizure of the property subject to forfeiture. But even if it were the holding of the case, it would have no application to the present case, because here there *was* a

---

*As JUSTICE BLACKMUN points out, where funds have been accidently deposited into the wrong account, the Comptroller General has assumed that a deposit may be corrected without an express appropriation. *Ante*, at 92. So, too, reasons JUSTICE BLACKMUN, would it be "unrealistic . . . to require congressional authorization before a data processor who misplaces a decimal point can 'undo' an inaccurate transfer of Treasury funds." *Ibid.* This may be so, but this is not our case. For the funds at issue were not accidently deposited into the Treasury, but rather intentionally transferred there once a valid judgment of forfeiture had been entered by the District Court.

final decree entered by the District Court in favor of the Government. It is petitioner's failure to post a bond or obtain a stay of that judgment which has brought the present controversy to this Court.

In any event, even if there are circumstances in which funds that have been deposited into the Treasury may be returned absent an appropriation, I believe it unnecessary to plow that uncharted ground here. The general appropriation for payment of judgments against the United States provides in part:

> "(a) Necessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when—
> "(1) payment is not otherwise provided for;
> "(2) payment is certified by the Comptroller General; and
> "(3) the judgment, award, or settlement is payable—
> "(A) under section 2414, 2517, 2672, or 2677 of title 28. . . ." 31 U. S. C. § 1304.

Title 28 U. S. C. § 2414, in turn, authorizes the payment of "final judgments rendered by a district court . . . against the United States." Together, §§ 1304 and 2414 would seem to authorize the return of funds in this case in the event petitioner were to prevail in the underlying forfeiture action.

But further inquiry is required, for we have said that § 1304 "does not create an all-purpose fund for judicial disbursement. . . . Rather, funds may be paid out only on the basis of a judgment based on a substantive right to compensation based on the express terms of a specific statute." *Office of Personnel Management* v. *Richmond,* 496 U. S. 414, 432 (1990). The question, then, is whether petitioner would have a "substantive right to compensation" if it were to prevail in this forfeiture proceeding. I believe 28 U. S. C. § 2465 provides such a right here. That section provides: "Upon

the entry of judgment for the claimant in any proceeding to . . . forfeit property seized under any Act of Congress, such property shall be returned forthwith to the claimant or his agent." Although § 2465 speaks of forfeitable "property" and not public money, the property subject to forfeiture in this case has been converted to proceeds now resting in the Assets Forfeiture Fund of the Treasury. I see no reason why § 2465 should not be construed as authorizing the return of proceeds in such a case. Therefore, I would hold that 31 U. S. C. § 1304, together with 28 U. S. C. § 2465, provide the requisite appropriation.

Because I believe there exists a specific appropriation authorizing the payment of funds in the event petitioner were to prevail in the underlying forfeiture action, I agree with JUSTICE BLACKMUN that a judgment for petitioner below would not be "useless." Accordingly, I concur in the judgment of the Court.

JUSTICE WHITE, concurring.

I agree with Parts I, II, and IV of the Court's opinion but would prefer not to address the Appropriations Clause issue.

As JUSTICE BLACKMUN indicates, *ante*, at 89, the Government argues that because the Appropriations Clause bars reaching the funds transferred to the Treasury's Assets Forfeiture Fund, the case is either moot or falls into the useless judgment exception to appellate *in rem* jurisdiction. I am surprised that the Government would take such a transparently fallacious position. The case is not moot and a ruling by the Court of Appeals would not be a useless judgment. Had the funds not been transferred to Washington, the Court of Appeals, if it thought the District Court had erred in rejecting the Bank's innocent-owner defense, would have been free to reverse the lower court, direct that the Bank be paid out of the res, and to that extent rule against the United States' forfeiture claim. The United States does not ques-

tion this, for when the property was sold, the Government agreed to hold the proceeds pending resolution of the claims against the res.

The funds are, of course, no longer in Florida, but that fact, as the Court now holds, did not deprive the Court of Appeals of jurisdiction to reverse the District Court and direct entry of judgment against the United States for the amount of the Bank's lien, nor did it prevent the Court of Appeals from declaring that the Bank was entitled to have its lien satisfied from the res and, therefore, that the Government had no legal entitlement to the proceeds from the sale of the house. The case is obviously not moot. Nor should the Government suggest that a final judgment against the United States by a court with jurisdiction to enter such a judgment is useless because the United States may refuse to pay it. Rather, it would be reasonable to assume that the United States obeys the law and pays its debts and that in most people's minds a valid judgment against the Government for a certain sum of money would be worth that very amount. This is such a reasonable expectation that there is no need in this case to attempt to extract the transferred res from whatever fund in which it now is held.

There is nothing new about expecting governments to satisfy their obligations. Thus, in *Steffel* v. *Thompson,* 415 U. S. 452, 468–471 (1974), the Court discussed the comparative propriety of entering a declaratory judgment as opposed to an injunction. Describing the cases of *Roe* v. *Wade,* 410 U. S. 113 (1973), and *Doe* v. *Bolton,* 410 U. S. 179 (1973), the Court explained:

> "In those two cases, we declined to decide whether the District Courts had properly denied to the federal plaintiffs, against whom no prosecutions were pending, injunctive relief restraining enforcement of the Texas and Georgia criminal abortion statutes; instead, we affirmed the issuance of declaratory judgments of unconstitution-

ality, anticipating that these would be given effect by state authorities." 415 U. S., at 469.

See also *Roe, supra,* at 166: "We find it unnecessary to decide whether the District Court erred in withholding injunctive relief, for we assume the Texas prosecutorial authorities will give full credence to this decision that the present criminal abortion statutes of that State are unconstitutional"; *Bolton, supra,* at 201 (same). More generally, it goes without saying that a creditor must first have judgment before he is entitled to collect from one who has disputed the debt, and it frequently happens that the losing debtor pays up without more. Perhaps, however, the judgment creditor will have collection problems, but that does not render his judgment a meaningless event.

For the same reasons, it is unnecessary for the Court at this point to construe the Appropriations Clause, either narrowly or broadly. Normally, we avoid deciding constitutional questions when it is reasonable to avoid or postpone them. *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.,* 467 U. S. 138, 157 (1984); *Liverpool, New York & Philadelphia S. S. Co.* v. *Commissioners of Emigration,* 113 U. S. 33, 39 (1885). It is apparent, moreover, that the Court has struggled to reach a satisfactory resolution of the Appropriations Clause issue. I would not anticipate that the United States would default and that the Bank would require the help of the Judiciary to collect the debt. I would leave it to the Executive Branch to determine in the first instance, when and if it suffers an adverse judgment, whether it would have authority under existing statutes to liquidate the judgment that might be rendered against it. It will be time enough to rule on the Appropriations Clause when and if the position taken by the Government requires it.

I bow, however, to the will of the Court to rule prematurely on the Appropriations Clause, and on that issue I agree with THE CHIEF JUSTICE and join his opinion.

JUSTICE STEVENS, concurring in part and concurring in the judgment.

While I agree with JUSTICE BLACKMUN's analysis of the Government's Appropriations Clause argument, and join his opinion in its entirety, I also agree with THE CHIEF JUSTICE that 31 U. S. C. § 1304, together with 28 U. S. C. § 2465, provide a satisfactory alternative response. Moreover, like JUSTICE WHITE, and for the reasons stated in his separate opinion, I am surprised that the Government would make "such a transparently fallacious" argument in support of its unconscionable position in this case. See *ante*, at 96.

JUSTICE THOMAS, concurring in part and concurring in the judgment.

I cannot join the Court's discussion of jurisdiction because that discussion is unnecessary and may very well constitute an advisory opinion. In my view, we should determine the applicability of § 1521 of the Housing and Community Development Act of 1992, 106 Stat. 4062. Effective October 28, 1992, § 1521 amended 28 U. S. C. § 1355 to provide that "[i]n any case in which a final order disposing of property in a civil forfeiture action or proceeding is appealed, removal of the property by the prevailing party shall not deprive the court of jurisdiction." 106 Stat. 4062–4063. The clear import of the new law is to preserve the jurisdiction of a court of appeals in a civil forfeiture action where the res has been removed by the prevailing party—the very issue involved in this case. This law would appear by its plain terms to be dispositive of this case, thus rendering academic the discussion in Part II of the Court's opinion.*

The Court mentions § 1521 in a single footnote, stating simply that "we do not now interpret that statute or deter-

---

*By letter dated October 30, 1992, the Government advised the Court of the enactment of the new law without taking a position on its applicability. On November 3 petitioner informed us by letter that in its view § 1521 applies and is controlling.

mine the issue of its retroactive application to the present case." *Ante*, at 89, n. 5. As a general rule, of course, statutes affecting substantive rights or obligations are presumed to operate prospectively only. *Bennett* v. *New Jersey*, 470 U. S. 632, 639 (1985). "Thus, congressional enactments . . . will not be construed to have retroactive effect unless their language requires this result." *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 208 (1988). But not every application of a new statute to a pending case will produce a "retroactive effect." "[W]hether a particular application *is* retroactive" will "depen[d] upon what one considers to be the determinative event by which retroactivity or prospectivity is to be calculated." *Kaiser Aluminum & Chemical Corp.* v. *Bonjorno*, 494 U. S. 827, 857, and n. 3 (1990) (SCALIA, J., concurring) (emphasis in original).

In the case of newly enacted laws restricting or enlarging jurisdiction, one would think that the "determinative event" for retroactivity purposes would be the final termination of the litigation, since statutes affecting jurisdiction speak to the power of the court rather than to the rights or obligations of the parties. That conclusion is supported by long-standing precedent. We have always recognized that when jurisdiction is conferred by an Act of Congress and that Act is repealed, "the power to exercise such jurisdiction [is] withdrawn, and . . . all pending actions f[a]ll, as the jurisdiction depend[s] entirely upon the act of Congress." *Assessors* v. *Osbornes*, 9 Wall. 567, 575 (1870). "This rule—that, when a law conferring jurisdiction is repealed without any reservation as to pending cases, all cases fall with the law—has been adhered to consistently by this Court." *Bruner* v. *United States*, 343 U. S. 112, 116–117 (1952). See *id.*, at 117, n. 8 (citing cases). Moreover, we have specifically noted that "[t]his jurisdictional rule does not affect the general principle that a statute is not to be given retroactive effect unless such construction is required by explicit language or by necessary implication." *Ibid.*

The same rule ordinarily mandates the application to pending cases of new laws *enlarging* jurisdiction. We so held in *United States* v. *Alabama,* 362 U. S. 602 (1960) *(per curiam).* There, the District Court had concluded that it was without jurisdiction to entertain a civil rights action brought by the United States against a State, and the Court of Appeals had affirmed. *Id.,* at 603. While the case was pending before this Court, the President signed the Civil Rights Act of 1960, which authorized such actions. Relying on "familiar principles," we held that "the case *must* be decided on the basis of law now controlling, and the provisions of [the new statute] are applicable to this litigation." *Id.,* at 604 (emphasis added) (citing cases). We therefore held that "the District Court has jurisdiction to entertain this action against the State," and we remanded for further proceedings. *Ibid.* Similarly, in *Andrus* v. *Charlestone Stone Products Co.,* 436 U. S. 604 (1978), we held that because the general federal-question statute had been amended in 1976 to eliminate the amount-in-controversy requirement for suits against the United States, "the fact that in 1973 respondent in its complaint did not allege $10,000 in controversy *is now of no moment." Id.,* at 608, n. 6 (emphasis added).

It could be argued that the language of § 1521 implies an earlier determinative event for retroactivity purposes—such as the removal of the res or the point when the final order disposing of the property "is appealed." 106 Stat. 4062. I do not find these terms sufficiently clear to overcome the general rule that statutes altering jurisdiction are to be applied to pending cases; I would therefore decide this case on the basis of the new law. If the Court is plagued with doubts about the "retroactive application" of § 1521, *ante,* at 89, n. 5, the Court should, at a minimum, seek further briefing from the parties on this question before embarking on what appears to me to be an unnecessary excursion through the law of admiralty. There is no legitimate reason not to take the time to do so, for if the Government were to concede the

new law's applicability, the Court's opinion would be advisory. I can, therefore, concur only in the Court's judgment on the issue of jurisdiction.

I do, however, join the opinion of THE CHIEF JUSTICE regarding the Appropriations Clause. Because the Court of Appeals retains continuing jurisdiction over this proceeding pursuant to § 1521, we cannot avoid addressing the Government's arguments on this issue.