United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 7, 2005**

Charles R. Fulbruge III
Clerk

REVISED JULY 15, 2005
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-40666

_____

EURASIA INTERNATIONAL LTD, Individually and as Assignee

Plaintiff - Appellant

v.

HOLMAN SHIPPING INC; NORTH AMERICAN MARINE REPAIR & CLEANING INC;
OLYMPUS STEAMSHIP AGENCIES; ROYAL BANK OF SCOTLAND; GULF MARINE AND
INDUSTRIAL SUPPLIES INC

Intervenor Plaintiffs - Appellees

v.

M/V EMILIA, Etc

Defendant
_____

Appeal from the United States District Court
for the Eastern District of Texas, Beaumont
_____

Before KING, Chief Judge, and BARKSDALE and STEWART, Circuit

Judges.

KING, Chief Judge:

Plaintiff-Appellant Eurasia International, Ltd. appeals the

district court's entry of summary judgment in favor of

Intervenor-Appellee Royal Bank of Scotland.  Because we lack in

rem jurisdiction over this matter, under the useless judgment

doctrine, we are compelled to DISMISS Eurasia's appeal.

# I. FACTUAL AND PROCEDURAL BACKGROUND

On September 20, 1994, the Royal Bank of Scotland ("RBS") entered into a loan agreement with Candour Marine, Ltd., the former owner of the M/V EMILIA. Pursuant to the loan agreement, RBS loaned Candour $2,000,000 to finance part of the purchase of the M/V EMILIA. On September 21, 1994, Candour and RBS entered into a mortgage and deed of covenant securing the loan agreement. RBS performed all acts required to perfect the mortgage as a first preferred ship mortgage.

On November 22, 1998, Candour bareboat chartered the M/V EMILIA to Sun Rose Shipping, Ltd. ("Sun Rose"). On December 11, 1998, Sun Rose entered into a standard ship management agreement with Appellant Eurasia International Ltd. ("Eurasia"). The agreement contained an English choice of law and arbitration provision.

Eurasia performed its duties under the agreement, but Sun Rose did not pay Eurasia for its services. Thus, on June 18, 1999, Eurasia filed an in rem claim against the M/V EMILIA to recover its expenses. First, Eurasia claimed $151,655 in custodia legis expenses (expenses accumulated in maintaining and preserving a vessel after it has been seized under a legal process). Second, Eurasia asserted that it had a maritime lien in the amount of $161,487 against the M/V EMILIA as assignee for paid seaman's wages. Finally, Eurasia claimed $319,323 in

2

assigned expenses for necessaries supplied by foreign and domestic suppliers and for technical management fees. Eurasia also filed a motion to arrest the vessel, which the court granted that same day.

Several claimants (collectively referred to as the "Intervenors") intervened in the in rem proceeding, asserting maritime liens for unpaid goods and services provided to the M/V EMILIA. Specifically, on June 29, 1999, Holman Shipping, Inc. ("Holman"), North American Marine Repair & Cleaning Inc. ("North American"), and Olympus Steamship Agencies ("Olympus") filed motions to intervene, asserting maritime liens for necessaries in the amount of $21,540, $18,500, and $28,165.86, respectively. On August 6, 1999, RBS also intervened, asserting its status as a preferred mortgage lien holder of the M/V EMILIA in the amount of $1,442,183.44. Finally, on October 14, 1999, Gulf Marine and Industrial Supplies, Inc. ("Gulf") filed a motion to intervene, asserting a maritime lien for necessaries in the amount of $6,079.

On October 16, 1999, the United States Marshal sold the M/V EMILIA at auction for $195,000. On November 17, 1999, after collecting his commission from the sale proceeds, the Marshal deposited $192,060 into the district court's registry. The claims far exceeded the sale proceeds, and that shortage led the claimants to assert their lien priorities.

After the vessel's sale, Candour brought an in personam

3

claim against Eurasia. On December 21, 2001, the district court stayed the in rem action brought by Eurasia against the M/V EMILIA pending the arbitration of the in personam claim between Eurasia and Candour in London. On March 6, 2003, Eurasia received an award in the London arbitration. On April 4, 2003, the district court lifted the stay on the in rem claim and confirmed the March 6, 2003 arbitration award in favor of Eurasia and against Candour. The court limited its confirmation of the arbitration award, stating that the award had no effect with respect to any remaining issues or claims existing between the parties and that the award was dispositive only of the claims between Eurasia and Candour.

On July 1, 2003, Eurasia moved for partial summary judgment on its claims. A few months later, on November 21, 2003, Eurasia again moved for summary judgment and distribution of funds, arguing that it was entitled to the sales proceeds as an assignee of preferred maritime liens and for custodia legis expenses. In order to avoid additional costs and attorney's fees, Eurasia entered into a conditional agreed distribution settlement with Gulf, Holman, North American, and Olympus, under which those four intervenors would receive a predetermined portion of the funds in the court's registry if Eurasia were to prevail. On November, 21, 2003, RBS also filed a motion for partial summary judgment, requesting a determination that the claims filed by Gulf, Holman, North American, and Olympus were superior to those of RBS, and

4

thus that they were entitled to $74,284.86 of the funds in the court's registry. RBS also asserted that, as holder of a preferred mortgage lien, it was entitled to the remainder of the funds in the court's registry.

On April 14, 2004, the magistrate judge recommended that the district court grant RBS's motion and deny Eurasia's motion. The magistrate judge further recommended that Gulf receive $6,079, Holman receive $28,165.86, North American receive $21,540, Olympus receive $18,500, and RBS receive $117,775.14 of the proceeds of the sale. To arrive at its recommendation, the judge concluded that RBS's claims to the proceeds outranked Eurasia's claims under both English and U.S. law because Eurasia: (1) did not have a maritime lien under English law; (2) did not have any lien rights under U.S. law; and (3) did not incur custodia legis expenses upon the authority of the court and equitable relief for those expenses was not justified.

On May 3, 2004, the district court adopted the magistrate judge's findings of fact and conclusions of law, granted RBS's motion for summary judgment, and denied Eurasia's motion. Accordingly, the court entered final summary judgment in favor of RBS, disposing of the in rem claims and ordering the distribution of the sale proceeds to the Intervenors. On May 12, 2004, Eurasia moved the district court for an order staying the disbursement of the sale proceeds until May 24, 2004. After a hearing on May 19, Eurasia's motion was granted to give it time

to obtain and file a supersedeas bond.  Eurasia was unsuccessful in filing the bond within the time limit, and the court entered an order disbursing the sale proceeds on May 24, 2004.

On May 18, 2004, Eurasia appealed the district court's judgment, arguing that the district court erred by concluding, inter alia, that Eurasia did not have a valid maritime lien for its assigned seaman's wages or its custodia legis expenses. Eurasia asserts that its claims have priority and must therefore be paid before the Intervenors' claims.

## II. DISCUSSION

The Intervenors argue that because Eurasia failed to stay enforcement of the district court's final judgment and because the district clerk disbursed the proceeds from the sale of the M/V EMILIA to the Intervenors, a judgment in this action would be useless and that this court thus lacks in rem jurisdiction under the useless judgment doctrine.  Eurasia, on the other hand, argues that the useless judgment doctrine does not apply because the court's jurisdiction is based solely on the appeal from the district court's final judgment.

The Supreme Court addressed the useless judgment doctrine in Republic National Bank of Miami v. United States, 506 U.S. 80 (1992).  The issue facing the Court was whether the court of appeals could continue to exercise in rem jurisdiction in a civil forfeiture proceeding after the res (i.e., the property), then in

6

the form of cash, was removed by the United States Marshal from the judicial district and deposited in the United States Treasury. Republic, 506 U.S. 81-82. In Republic, the government sought forfeiture of a residence on the basis that the owner had purchased it with the proceeds of narcotics trafficking. Republic National Bank of Miami then filed a claim asserting a lien on the property. The property was sold and the marshal retained the proceeds pending the disposition of the case. The district court subsequently entered judgment, denying Republic's claim and forfeiting the sale proceeds to the United States. Republic filed a timely notice of appeal but did not post a supersedeas bond or seek to stay the execution of judgment. The proceeds were transferred to the Assets Forfeiture Fund of the United States Treasury. The government then moved to dismiss the appeal for lack of jurisdiction, and the court of appeals granted the motion, reasoning that the removal of the proceeds terminated the court's jurisdiction. The Supreme Court reversed, holding that the court did not lose jurisdiction when the proceeds were transferred to the Assets Forfeiture Fund of the United States Treasury. Id. at 93. The Court stated that in The Rio Grande, 90 U.S. 458 (1874):

> this Court held that improper release of a ship by a marshal did not divest the Circuit Court of jurisdiction. We do not understand the law to be that an actual and continuous possession of the res is required to sustain the jurisdiction of the court. When the vessel was seized by the order of the court and brought within its control the jurisdiction was complete.

Id. at 85. The Court also quoted The Little Charles, 26 F. Cas. 979, 982 (C.C. Va. 1818) (No. 15,612), stating that:

> continuance of possession was not necessary to maintain jurisdiction over an in rem forfeiture action [because] jurisdiction, once vested, is not divested, although a state of things should arrive in which original jurisdiction could not be exercised. . . . [I]n some cases there might be an exception to the rule, where the release of the property would render the judgment useless because the thing could neither be delivered to the libellants, nor restored to the claimants. . . . [T]his exception will not apply to any case where the judgment will have any effect whatever.

Id. at 85 (internal citations, quotation marks, and emphasis omitted). The Court specifically analyzed whether the Appropriations Clause of the United States Constitution, which provides that "No money shall be drawn from the treasury, but in Consequence of Appropriations made by law," rendered the proceeds out of reach such that the useless judgment doctrine would apply. Id. at 93. The Court concluded that the Appropriations Clause did not render the proceeds unreachable because 31 U.S.C. § 1304 (which provides that funds may be paid out only pursuant to a judgment based on a substantive right derived from the express terms of a specific statute) and 28 U.S.C. § 2465 (which provides that property shall be returned to a claimant upon the entry of judgment for such claimant in any proceeding to forfeit property seized under any Act of Congress) provide a specific appropriation authorizing the payment of funds in the event that Republic were to prevail in the underlying forfeiture action.

8

Id. at 95-96.  Accordingly, the Court held that the court of appeals had jurisdiction because, although the proceeds were not present in the court, a judgment would not be useless because the funds in the Assets Forfeiture Fund of the United States Treasury could be reached.  Id. at 96.

Republic makes clear that the mere payout of the proceeds from the district court's registry did not strip this court of jurisdiction.  If, however, the disbursal of those proceeds would render a judgment from this court useless, then this court does not have jurisdiction.  Thus, our inquiry focuses on whether a judgment by this court--that the district court erred in concluding that Eurasia did not have a maritime lien entitling it to the proceeds--would be useless to Eurasia.  As indicated in Republic, a judgment by this court would be useless if the res, in this case the proceeds of the M/V EMILIA, could not be delivered to Eurasia.

To guide our inquiry, we draw upon other cases in this circuit that have addressed the useless judgment doctrine.  See, e.g., Bargecarib Inc. v. Offshore Supply Ships Inc., 168 F.3d 227 (5th Cir. 1999); Newpark Shipbuilding & Repair, Inc. v. M/V Trinton Brute, 2 F.3d 572 (5th Cir. 1993) (per curiam).  In Bargecarib, Bargecarib filed an in rem complaint against the M/V SOVEREIGN for breach of a time charter.  168 F.3d at 228.  The vessel was arrested but released after the district court concluded that the vessel's owner did not breach the time

9

charter. Bargecarib appealed the district court's order vacating the seizure, and the Fifth Circuit reversed. The court determined that it had jurisdiction over the appeal even though the vessel was no longer in the district court's possession, reasoning that a judgment that the vessel owner breached the time charter was not useless because Bargecarib could use the judgment as a basis for re-siezing the vessel and as a basis for pursuing the vessel's owner personally. Id. at 231. Bargecarib is clearly distinguishable from the case at hand. Here, a judgment that Eurasia had a maritime lien entitling it to the proceeds of the M/V EMILIA's sale could not be the basis for re-seizing the vessel because the M/V EMILIA was sold, and the sale of a vessel extinguishes all liens. Newpark, 2 F.3d at 573. Moreover, a judgment from this court could not serve as the basis for pursuing the Intervenors personally.

In Newpark, a case decided after Republic, Newpark brought an in rem action against the M/V TRINTON BRUTE to recover for repairs it made on the vessel. 2 F.3d at 572. The district court entered judgment in favor of Newpark and ordered the vessel to be sold. Newpark was the successful bidder at the sale and substituted its judgment in lieu of payment for the vessel. Newpark took title to the vessel and subsequently sold it to the vessel's former owner. The owner then appealed the court's judgment in favor of Newpark, and Newpark moved to dismiss for lack of jurisdiction. The court noted that in Republic, the

10

useless judgment exception did not apply because the government had possession of the specific substitute res (the sale proceeds) and an appropriations statute authorized the payment of funds in the event petitioner were to prevail in the underlying forfeiture action. The court, however, distinguished the case before it from Republic, stating:

> In this case, by contrast, there never was a substitute res. Newpark used its judgment to purchase the TRINTON BRUTE; no money changed hands as a result of the marshal's sale. Moreover, the vessel is no longer the res; a marshal's sale discharges all liens against the ship and grants the purchaser title free and clear of liens. Unlike the situation in Republic, we cannot trace the res or its proceeds to a particular fund in Newpark's possession. A judgment in favor of appellant in this case would be effectively unenforceable. . . . [T]here is nothing in Newpark's possession that could be regarded as the res. For [the vessel's owner] to be able to recover from Newpark, we would effectively have to convert the judgment from one in rem to a judgment in personam. We decline to so extend the holding in Republic.

2 F.3d at 573 (internal citation omitted). Thus, the court dismissed the vessel owner's appeal, stating that the case fell within the useless judgment exception to appellate in rem jurisdiction. Id. Applying Newpark to the facts at hand, it becomes clear that a judgment from this court would be useless. Here, although the substitute res, the proceeds from the sale, were distributed to the Intervenors, we do not know if they still have the substitute res in their possession. The difficulty lies in the fact that the substitute res here is money, which is fungible, and unlike in Republic, the proceeds here cannot be traced to a particular fund in the Intervenors' possession.

11

Moreover, unlike Republic, there is no statute allowing this court to reach the proceeds once paid out. Thus, a judgment in this case would be effectively unenforceable because, like Newpark, there is nothing in the Intervenors' possession that could be regarded as the res. If we were to render judgment in favor of Eurasia, and allowed Eurasia subsequently to recover the amount it was allegedly owed from the Intervenors, this court would effectively be rendering a judgment in personam.[1] The Fifth Circuit specifically declined to do that in Newpark.[2]

In a similar case, the Eleventh Circuit held that it had no

---

[1] A judgment in personam imposes personal liability on a party and may therefore be satisfied out of any of the party's property within judicial reach. 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1064 at 335 (3d ed. 2002) [hereinafter WRIGHT & MILLER]; BLACK'S LAW DICTIONARY 848 (7th ed. 1999). A judgment in rem determines the status or condition of property and operates directly on the property itself. 4A WRIGHT & MILLER, § 1070 at 286; BLACK'S LAW DICTIONARY 847.

[2] In American Bank of Wage Claims v. Registry of District Court of Guam, 431 F.2d 1215 (9th Cir. 1970), the Ninth Circuit stated that if the case were "remanded to the district court to recover the 'res,' that court would become entangled in an elaborate exercise in tracing, identifying, recovering and then redistributing any recovered monies, . . . an effort caused solely by appellants' failure to take timely and legal steps to prevent the final disbursement. The district court is not now obligated so to act, nor are we inclined or required so to order it." The court further stated that "even if ultimately the distributees were successfully determined and located, nevertheless ordering repayment of funds into the Registry would, under the circumstances of this case, implicitly erase the distinction between in personam and in rem jurisdiction and work an unprecedented extension of the latter." Id. Although American was decided before Republic and is not binding upon this court, it is helpful to illustrate that requiring the Intervenors to return the disbursed proceeds would work effectively to turn this into an in personam action in violation of Newpark.

12

jurisdiction under the useless judgment doctrine.  United States v. 3262 SW 141 Ave., 33 F.3d 1299 (11th Cir. 1994).  In 3262 SW 141 Ave., the government filed a civil complaint in rem for forfeiture of a residence.  After the owners failed to appear, the district court granted default judgment in favor of the government.  The final judgment also adjudicated the rights of two creditors that had filed claims.  The owner then moved to set aside the default judgment, but a magistrate judge recommended that the owner's motion be denied.  Before the district court adopted the magistrate's recommendation, it granted the owner's motion to stay the execution of the forfeiture judgment and granted the government's motion to sell the property.  The proceeds of the sale were deposited in the registry of the court.  The district court subsequently adopted the magistrate's recommendation to deny the motion to set aside the default and ordered the distribution of the sale proceeds to the two creditors.  The owner appealed the district court's judgment denying his motion to set aside the default judgment.  The government then filed a motion to dismiss the appeal, arguing that the court no longer had in rem jurisdiction.  The court agreed with the government, reasoning that:

> In this case, it is undisputed that the subject real property has been sold and the proceeds disbursed completely to the priority claimants . . . . [The owners] can neither have their home restored to them nor acquire any proceeds from that sale should they obtain a judgment in their favor. Therefore, a judgment for [the owners] would be useless, and we are without jurisdiction to

13

proceed to the merits of their consolidated appeal.
Id. at 1303-04.  Similarly, the proceeds here were distributed to
the Intervenors.  In addition, Eurasia can neither re-seize the
vessel nor acquire the proceeds from the Intervenors if they
received a judgment from this court.  Thus, a judgment from this
court in Eurasia's favor would be useless.[3]

Alternatively, Eurasia argues that the useless judgment
doctrine does not apply because the notice of appeal implicitly
contains a stay provision and, in any event, Eurasia filed a
motion to stay the disbursement of funds contingent on its filing
a supersedeas bond.  However, FED. R. CIV. P. 62(d) provides that
a party is entitled to an automatic stay of proceedings to
enforce a judgment upon appeal when it posts a supersedeas bond.
See also Hebert v. Exxon Corp., 953 F.2d 936, 938 (5th Cir. 1992)
(per curiam).  Because Eurasia did not post a supersedeas bond,
it was not entitled to an automatic stay upon its appeal to this

_____

[3]       Recognizing that disbursing the proceeds from the court's
registry could divest the court of jurisdiction, the United States
District Court for the Eastern District of Louisiana has stayed the
disbursement of funds from the court's registry pending the outcome
of an appeal.  Silver Star Enters., Inc. v. SARAMACCA M/V, No. 92-
1297, 1994 WL 665792, at *1 (E.D. La. Nov. 29, 1994) (citing
Newpark, 2 F.3d at 572) (stating that "disbursing [the] funds to
[one party] prior to completion of [the other party's] appeal could
cause [the other party] to effectively lose its right of appeal by
divesting the Fifth Circuit Court of Appeals of jurisdiction").
The same court has also applied the useless judgment doctrine,
holding that it did not have jurisdiction where the court vacated
the seizure of a vessel because a judgment in rem would be
unenforceable.  Martin v. M/V ELIZA, No. 95-1955, 1995 WL 442073
(E.D. La. July 25, 1995).

14

court.

Under the case law discussed above, it is clear that this court has no jurisdiction over Eurasia's appeal under the useless judgment doctrine.  Thus, we do not address the merits of Eurasia's appeal.

### III. Conclusion

For the foregoing reasons, we DISMISS Eurasia's appeal.