UNITED STATES of America,
Plaintiff,

v.

ALL FUNDS IN ACCOUNT NOS. 747.034/278, 747.009/278, & 747.714/278 IN BANCO ESPANOL DE CREDITO, SPAIN, Defendants.

No. Civ.A. 97–2436 TPJ.

United States District Court, District of Columbia.

May 4, 2001.

Laurel Loomis, Cynthia Stone, U.S. Department of Justice, Asset Forfeit. & Money Laundering Section, Washington, DC, for United States of America, plaintiff.

Juan Ramon Matta, Florence Prison Facility, Florence, CO, claimant pro se.

Alan Michael Freeman, Dyer, Ellis & Joseph, Washington, DC, for Nancy Marlene Vasquez–Martinez, claimant.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Plaintiff United States brings this *in rem* proceeding pursuant to 21 U.S.C. § 881(a)(6) to effect the forfeiture of all funds in the three defendant bank accounts (totaling in the aggregate approximately $4.6 million) in Banco Espanol de Credito ("Banco Espanol"), a Spanish bank. The United States filed its original complaint on October 20, 1997 seeking forfeiture of account No. 747.034/278 (the "034 account") and amended the complaint in July, 1999, to seek forfeiture of accounts No. 747.009/278 (the "009 account") and No. 747.714/278 (the "714 account") as well. The funds in all three accounts were allegedly "furnished or intended to be furnished ... in exchange for a controlled substance" or represented "proceeds traceable to such an exchange" or moneys "used or intended to be used to facilitate [a] violation of" the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* 21 U.S.C. § 881(a)(6). Specifically, the government contends that the funds represent proceeds from drug trafficking activities of one Juan Ramon Matta Ballesteros ("Matta"), a notorious international drug trafficker from the early 1970s through 1988, involving thousands of kilos of cocaine and millions of dollars. According to documents received by the Drug Enforcement Administration ("DEA") from Spanish authorities, Matta lived in Spain at various times during the 1980s. Matta was eventually convicted of three serious drug offenses in the Central District of California in 1990–91 and is presently serving three consecutive life sentences in a federal prison.

The adverse claimant to the funds in this proceeding is Nancy Marlene [Marlen] Vasquez–Martinez ("Vasquez"), Matta's wife. She answered the amended complaint and filed a claim of ownership on August 31, 1999, having previously answered the original complaint and claimed ownership of the 034 account in March, 1998.

Presently pending before the Court are the parties' cross-motions for summary judgment. The parties have stipulated that the defendant funds in all three accounts are of forfeitable character under 21 U.S.C. § 886(a)(6), and that if this Court denies claimant's summary judgment motion, Vasquez consents to the entry of judgment dismissing all of her claims to the defendant property with prejudice.

The cross-motions for summary judgment essentially present two questions: does the Court have subject matter jurisdiction over the defendant bank accounts and was the action timely filed.

## I.

The record discloses as undisputed fact that the 034 account was opened on April 28, 1983 by one Maria Elena Forero ("Forero") with $985,000 in U.S. currency

that she believed belonged to Vasquez. Forero worked as Matta's housekeeper. Authorized signatories on the account included Vasquez and an alias Matta was known to use. Although not discovered until 1999, the 714 account was opened in 1981 in the name of "Lurny Holdings, S.A." Nancy Vasquez Martinez, an alias used by Vasquez, was listed as an authorized signatory. (All efforts by Spanish authorities to identify the country of incorporation and / or any corporate officers or employees for Lurny Holdings in Spain have met with negative results.) The 009 account was opened in 1983 in the name of Maria Carmen Valbuena Fernandez ("Fernandez") with authorized signatories of Nancy Marlen Vasquez and Jose Lopez Rojas, a Matta alias. (At the time of opening the account, the person claiming to be "Fernandez" presented a Colombian passport to Banco Espanol, but Spanish authorities have since been unable to verify the existence of "Fernandez" in Spain or Colombia.)

The government has submitted declarations from special agents of the DEA asserting that they are unaware of any evidence that Matta and / or Vasquez had or have any source of legitimate income not originally derived from drug activities that would generate the amount of money known to be in the three accounts.

## II.

■ The jurisdictional grant for forfeiture cases is set forth in 28 U.S.C. § 1355.

In 1992, this statute was amended to unify the matters of jurisdiction, venue, and service of process in civil forfeiture cases so that the government would no longer have to file multiple forfeiture actions in different districts. As amended, 28 U.S.C. § 1355 now expressly provides for jurisdiction in the U.S. District Court for the District of Columbia

> [w]henever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government.

28 U.S.C. § 1355(b)(2). Section 1355(d) allows nationwide service of process, although it does not address service of process on property located in a foreign country.[1] The Court has found only two relevant cases concerning forfeiture of funds in foreign bank accounts under the 1992 amendments to § 1355: *United States v. All Funds on Deposit in the Names of Meza*, 63 F.3d 148 (2d Cir. 1995); and *United States v. All Funds in "Anaya Trust" Account*, No. C–95–0778, 1997 WL 578662, (N.D.Cal. Aug. 16, 1997).

■ "[I]n order to initiate a forfeiture proceeding against property located in a foreign country, the property must be within the actual or constructive control of the district court in which the action is commenced." *Meza*, 63 F.3d at 153.[2] In *Meza*, the Second Circuit concluded that the district court possessed the requisite

---

1. The statutory language reads: "[a]ny court with jurisdiction over a forfeiture action pursuant to subsection (b) may issue and cause to be served in any other district such process as may be required to bring before the court the property that is the subject of the forfeiture action." 28 U.S.C. § 1355(d).

2. Contrary to claimant's argument, the Court need not physically possess the *res* in order to have jurisdiction; constructive possession

over the property at the time the complaint is filed is sufficient. *See e.g., The Brig Ann*, 13 U.S. (9 Cranch) 289, 290, 3 L.Ed. 734 (1815); *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 86, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992) ("Fairly read, *The Brig Ann* simply restates the rule that the court must have actual or constructive control of the res when an *in rem* forfeiture suit is initiated.").

constructive control over funds located in bank accounts in England to establish its subject matter jurisdiction of the case. At the request of the United States, the British High Court had issued a restraining order freezing the funds in 1990, and extended it in 1994. At the request of the U.S. Marshals Service, British law enforcement officers had served copies of the forfeiture complaint and warrant on the banks holding the funds. *Id.* at 153. From these actions, the *Meza* court observed that:

> the United Kingdom acted essentially as an agent of the United States for purposes of this forfeiture action. Every action of the British law enforcement officials has been in direct response to requests from federal authorities. Moreover, the government indicates that in at least two other separate proceedings, the United Kingdom has returned funds to the United States after registering and enforcing decrees of forfeiture entered by a district court.

*Id.* at 154. Based on the collaboration shown between the U.S. and Britain, it held that "the government has met its burden of demonstrating that the British government will turn over at least a portion of the seized funds to the United States, thereby vesting the district court with the requisite constructive control over the funds."[3] *Id.*

The record before the Court in the instant case evinces a degree of cooperation between the United States and Spain that, as a practical matter, is indistinguishable from the cooperation between the United States and England underlying the agency relationship found to support jurisdiction

in *Meza.* Matta was indicted in the U.S. in numerous jurisdictions in the U.S. between 1979 and 1990, and he was convicted of drug-related offenses in three criminal trials in the Central District of California in 1990 and 1991. The U.S. had requested and received the assistance of Spain in connection with the investigations of Matta starting in 1981, *see* Gov't Ex. 12, and some of the information obtained as a result of cooperation between U.S. and Spanish law enforcement authorities led to Matta's arrest and prosecution.

The Treaty on Mutual Legal Assistance between the U.S. and the Kingdom of Spain ("MLAT") did not enter into force until June 30, 1993. The MLAT provides for mutual assistance including "immobilizing assets" and "assisting in procedures related to forfeiture." Article 1(2)(g) & (h). In August, 1993, invoking the MLAT, the United States made a request to the Central Authority of Spain for assistance in the forfeiture of funds belonging to Matta. *See* Claimant's Ex. 27. That request was forwarded to the Spanish investigating judge who, on September 22, 1993, ordered both the restraint of the funds and that notice of the same be given to Banco Espanol. *See* Claimant's Ex. 28 & 29. On September 30, 1993, Banco Espanol acknowledged receipt of the order of the Spanish Court. *See* Claimant's Ex. 30. Four years later, in September, 1997, the DOJ requested that the Spanish Ministry of Justice confirm that funds in the 034 account remained subject to restraint, which it did on October 17, 1997. *See* Claimant Ex. 33.

---

**3.** The only other relevant court decision on the issue, the *Anaya Trust* case in the Northern District of California, also concerned funds in a British bank account and appears to follow the reasoning of *Meza.* The *Anaya Trust* court found that "[b]ecause the funds in question had been transferred to the control of a British official cooperating with the United States ... the funds had been seized and that this *in rem* action was properly before it." *Anaya Trust,* 1997 WL 578662, at *3 (citing March 14, 1996 Order at 9–10).

On October 20, 1997, the DOJ filed this civil forfeiture complaint and on the same day, the Clerk's Office issued an arrest warrant directing the U.S. Attorney General to request that Spanish authorities continue to detain the defendant property. On November 3, 1997, Spanish Magistrate Judge Garzon advised the United States that the 034 account continued to be restrained as it had been since September 22, 1993. *See* Claimant's Ex. 34. On January 6, 1998, the U.S. requested Spanish authorities to deliver the complaint and arrest warrant to Banco Espanol. *See* Claimant's Ex. 35. Sometime thereafter, Banco Espanol conducted a more comprehensive review of all transactions concerning the original account, discovering a number of additional bank accounts over which Matta and Vasquez had control, including the 009 and 714 accounts. On May 25, 1999, Spanish Magistrate Judge Garzon ordered the restraint of the funds in the newly-discovered accounts. Judge Garzon stated that the restraint was proper "to guarantee a future forfeiture of goods, either by the Spanish authorities or the competent authorities in the USA if they were to seek an amplification of the Rogatory Commission sent previously regarding the accused in the present proceeding [Ms. Forero]." *See* Claimant's Ex. 36. On June 15, 1999 Judge Garzon issued another order further restraining the funds in response to a U.S. Rogatory Commission letter and ordered their transfer to a U.S. bank account to facilitate the forfeiture. *See* Claimant's Ex. 40.

The U.S. filed its amended complaint in this Court on July 27, 1999. An arrest warrant *in rem* was issued for the 009 and 714 accounts that was served, pursuant to U.S. request, upon Banco Espanol on October 22, 1997. *See* Gov't Exs. 10, 11.

The record thus amply demonstrates that the U.S. has received assistance from and worked in conjunction with Spanish authorities in connection with the investigation and prosecution of Matta for many years. The Spanish government has fulfilled numerous of its requests—and declined none—with respect to the seizure and forfeiture of the defendant bank accounts, in effect acting as an agent of the U.S. for purposes of the forfeiture. The government has submitted an affidavit from the Spanish prosecuting attorney affirmatively indicating his intent to comply with any order issued by this Court, *see* Gov't Reply, Ex. 1, and the Central Investigating Court Number Five of Madrid has issued an order expressly agreeing to the transfer of funds to the United States upon the entry of a final forfeiture order by this Court. *See* Claimant's Ex. 40. The U.S. has also submitted an affidavit from the Spanish magistrate confirming that Spain has no ongoing proceedings of its own for the forfeiture of the defendant property, the proceedings there having been provisionally closed. *See* Gov't Reply, Ex. 1.

In summary, the history of cooperation between authorities in the United States and Spain is at least equivalent to that of the cooperation between the United States and England found sufficient to support *in rem* jurisdiction in *Meza*, and the Court concludes that it has subject matter jurisdiction over the funds in question under 28 U.S.C. § 1355(b)(2). Having constructive control of them, it thus has *in rem* jurisdiction.

### III.

Title 19 U.S.C., § 1621, bars forfeiture claims unless they are commenced "within five years after the time when the alleged offense was discovered." Both parties agree that the five-year statute of limitations set forth in § 1621 applies in this case. They also agree that "the time

of absence from the United States of the person subject to the penalty or forfeiture, or of any concealment or absence of the property, shall not be reckoned within the 5–year period of limitation." 19 U.S.C. § 1621(2).

The Court finds that, although Matta's drug activities have been known to both U.S. and Spanish law enforcement agencies since the 1980s, the three defendant bank accounts were so "concealed" and / or "absent" from the United States as to toll the statute of limitations. The complaints were therefore timely filed.

All three of the accounts were opened outside the U.S. in the name of an individual or entity other than Vasquez and / or Matta. Each was opened with an initial deposit for a short fixed-term account that would then be extended for periods of years, generating interest all the while. The deposits were made in the form of cash, checks, or transfers *in U.S. currency*. No deposits other than the initial one were ever made. The authorized signatories used false names to order any withdrawals, and withdrawals were accomplished through the use of bank checks issued in names of fictitious persons. *See* Gov't. Ex. 8 ¶ 13. In short, the efforts of Matta and Vasquez to disguise the nature of the accounts were successful in evading their detection by law enforcement authorities in the U.S. and Spain notwithstanding the extensive investigations of the Matta organization during the 1980s in both countries. Only when Ms. Forero sought to withdraw money in June, 1992, and the bank itself noticed the signature card discrepancies were Spanish authorities alerted to the original account, the 034 account, and its connection to claimant and Matta.[4]

As of July, 1992, however, the 034 account was no longer concealed; the U.S. was aware of the account, and the U.S. certainly suspected that the account contained the proceeds of Matta's drug transactions. The Court concludes that any tolling of the limitations period for concealment as to the 034 account ended in July, 1992. The U.S. acknowledges that it learned informally of the 034 account in July, 1992 but contends that it did not formally "discover" the offense for limitations purposes until 1993 after the U.S. and Spain had entered into the MLAT that allowed the U.S. to take meaningful action towards forfeiture proceedings. The meaning the U.S. would have the Court ascribe to the word "discovery," however, is too strained to be tenable. The U.S. had clearly "discovered" both Matta's drug offenses and their connection to the 034 account as of July, 1992 and yet dallied for more than five years before attempting to reduce the funds to possession. Had the account been amenable to the jurisdiction of a U.S. court and accessible to forfeiture proceedings in the interim, the action would likely be barred as to the 034 account.

However, although tolling for concealment on the 034 account may have ended as of July, 1992, the text of § 1621 also provides that "the time ... of any ... absence of the property, shall not be reck-

---

4. Vasquez suggests that the U.S. was less than diligent in pursuing the possibility that other Matta bank accounts existed at Banco Espanol once account 034 was discovered. She submits two declarations by her one-time Spanish attorney who hypothesizes, with no showing of a basis for personal knowledge, that Banco Espanol possessed computer capability for a search of its records in the early 1990s, and even if not, a manual search would have eventually turned them up.

Whether or not true, the Court holds that the United States is under no duty to a claimant to otherwise forfeitable (and concealed) assets to cause a search to be conducted for them by a foreign bank sufficient to start the limitations clock running at the earliest possible moment.

oned within the 5–year period of limitations." 19 U.S.C. § 1621(2). The 034 account remained at all times in Spain and outside the constructive control of the United States until at least July, 1993, when the MLAT made extraterritorial forfeiture proceedings feasible, the significance of which is that the filing of the original complaint on October 20, 1997 occurred within the five-year period of limitations.

Vasquez cites *United States v. Islip*, 18 F.Supp.2d 1047, 1069–70 (C.I.T.1998) for the proposition that "absence" from the United States necessarily implies that the subject matter must have, at one time, been "present" here to have acquired a corporeal state of absence for purposes of tolling the statute of limitations. The Court of International Trade was addressing the amenability of a Canadian citizen, who had presumably never been in the United States, to a statutory penalty the United States sought to assess more than five years after the offense for which it had been incurred. Assuming the accuracy of the Court's proposition as a matter of statutory interpretation, which the Court regards as dubious, it is inapposite in this case.[5] The funds in each of the accounts for which the government seeks forfeiture were deposited *in U.S. currency*, from which it may conclusively be inferred that they were in the United States at some time prior to their departure for Spain, having begun their existence at the U.S. Treasury in Washington, D.C.

For the foregoing reasons, it is, this 4th day of May, 2001,

ORDERED, that plaintiff's motion for summary judgment [50] is granted; and it is

FURTHER ORDERED, that claimant's motion for summary judgment [46] is denied; and it is

FURTHER ORDERED, that plaintiff's motion to strike [74] is denied as moot; and it is

FURTHER ORDERED, that the Clerk of the Court forthwith enter judgment for plaintiff United States against the defendant property; and it is

FURTHER ORDERED, that the Clerk of the Court forthwith dismiss all of claimant's claims to the defendant property with prejudice; and it is

FURTHER ORDERED, that pursuant to 21 U.S.C. § 881(a)(6), defendant property is forfeited to the United States.

---

5. If it were true, forfeitable property accumulated abroad would be perpetually immune from forfeiture after five years.