UNITED STATES of America,
Plaintiff,

v.

CONTENTS OF ACCOUNT # 03001288, Held in the name of Tasneem Jalal located at Union National Bank, Rashidiya Branch, Deira–Dubai, United Arab Emirates; and Contents of Account # 01123121673, Held in the name of Tasneem Jalal located at Habib Bank AG Zurich, Sharjah Branch, United Arab Emirates; and Contents of Account # 01120121673, Held in the name of Tasneem Jalal located at Habib Bank AG Zurich, Sharjah Branch, United Arab Emirates, Defendants in rem.

No. CIV. 00–2630(WGB).

United States District Court,
D. New Jersey.

Oct. 11, 2001.

Peter W. Gaeta, Assistant United States Attorney, Newark, NJ, for United States of America.

Martin L. Schmukler, New York City, for Claimant, Tasneem Jalal.

## OPINION

BASSLER, District Judge.

This is a civil action *in rem* for the forfeiture of funds located in the three above-captioned bank accounts (collectively "the Defendant Accounts" or "the Accounts"), pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981. The United States seeks forfeiture of the funds because they are the alleged proceeds of Claimant Tasneem Jalal's illegal narcotics sales. Claimant contends that the funds are instead the lawful proceeds of his gold-trading activities in the United Arab Emirates.

The matter is now before the Court on Claimant's Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), or in the alternative for Summary Judgment. Also pending is the Claimant's motion for a Protective Order pursuant to Fed.R.Civ.P. 26(c). Broadly, Claimant contends that the action should be dismissed because 1) it was not filed within the five-year limitations period for commencement of forfeiture actions prescribed by 19 U.S.C. § 1621; and 2) because the Government's near eight-year delay between discovery of the funds' existence and commencement of the forfeiture action has deprived Claimant of his due process rights. Having heard oral argument on Claimant's motion and having reviewed supplemental submissions, the Court now concludes that both of Claimant's motions must be **denied** for the following reasons.

## I. BACKGROUND

The facts material to Claimant's motion are not in dispute.[1] Claimant Jalal was arrested on or about August 19, 1992 for his participation in the delivery of 250 grams of heroin into New Jersey. Claimant was subsequently indicted for Conspiracy to Distribute and Possess Heroin in violation of 21 U.S.C. § 846, and Possession with Intent to Distribute Heroin in violation of 21 U.S.C. § 841. Jalal pled guilty to both counts on October 15, 1992. After his guilty plea, but prior to his sentencing, Jalal admitted that he had been engaged in the trafficking of Heroin from Pakistan for approximately 16 years. He further admitted that on the day of his arrest he had planned on collecting a payment of approximately $48,000 for his heroin deliveries over the previous three years.

On June 29, 1993, Jalal was sentenced to 108 months in prison by United States District Judge Joseph H. Rodriguez. After serving his sentence, Jalal, a national of Pakistan, was committed to the custody of the Immigration and Naturalization Service. The INS deported Jalal to Pakistan on September 26, 2000.

On the same day that Jalal was arrested, a search warrant was executed at

---

1. The only fact in dispute is whether the contents of the accounts are drug proceeds or are proceeds of Claimant's lawful activities. When considering Claimant's motion to dismiss, the Court will for purposes of this decision accept the factual allegations in the Government's pleadings as true, and assume that the accounts contain illicit narcotics proceeds. *See Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 83 n. 1 (3d Cir.1987).

Jalal's home. The subsequent search revealed a number of things, including records of bank accounts at financial institutions in the United States, the United Arab Emirates ("U.A.E."), and Pakistan. (Verified Complaint ¶ 10.) Specifically, the search yielded deposit slips for the three Defendant Accounts, all of which are located in the U.A.E., and which contain approximately 1.4 million Dirhams (approximately $380,000.00).

The records recovered demonstrate that the Defendant Accounts were funded between November 24, 1991 and April 1, 1992, during the time that Claimant Jalal was engaged in illegal narcotics trafficking. (Complaint ¶ 11.) Jalal claimed that his wealth, including the account funds, derived from legitimate gold trading in Dubai.[2] (Decl. Of Michael J. Vaillancourt ("Vaillancourt Aff."), ¶ 3; Ex. B.) Despite being asked to do so, Jalal indicated that he was unsure if he could produce any documents to substantiate his claim. (*Id.*) As of the time the Government instituted the forfeiture proceeding, Claimant had still failed to provide any evidence to support the alleged legitimacy of his wealth.

In October, 1992, approximately 2 months after Jalal's arrest, agents of the D.E.A. informally approached the police in Dubai to determine whether the Defendant Accounts could be frozen while the investigation into the source of the funds in the Accounts continued. (Vaillancourt Aff. ¶ 4; Ex. C, ¶ 2.) As a result of this informal request, police in the U.A.E. obtained a local court order freezing the funds in at least one of the accounts. (*Id.*)

In or about August, 1994, representatives of the D.E.A. met with authorities in the U.A.E., to further pursue the matter of the Defendant Accounts. (Vaillancourt Aff. ¶ 5.) During that meeting, the local police in the U.A.E. indicated that they were optimistic that the Dubai court would entertain a motion to allow the Dubai Police or the United States to seize the accounts if probable cause could be established that the funds in the account were generated by narcotics trafficking, and that the Dubai police would be willing to present the forfeiture case to the Dubai court. (*Id.*) A similar meeting took place in Sharjah regarding the accounts there. (Vaillancourt Aff. ¶ 6.)

During this same general period, several of the Emirates took the first steps toward passage of a federal law in the U.A.E. on money laundering. (Vaillancourt Aff. ¶ 7.) While this legislation was pending, in January, 1995 U.S. authorities were informed that further unilateral action would not be taken against the Accounts, and that forfeiture would either need to be pursued through official diplomatic channels, or await passage of asset forfeiture/seizure legislation in the U.A.E. (Vaillancourt Aff. ¶ 8; Ex. C ¶¶ 3–4.)

Because no mutual assistance treaty existed between the United States and the U.A.E., on November 21, 1995 the United States was forced to make a treaty request for forfeiture of the funds pursuant to the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances. (Vaillancourt Aff. ¶ 11.) At the time the United States made the treaty request it knew the request might not have any effect, because at the time of the request the U.A.E. was not in compliance with the Vienna Convention of 1988 concerning money laundering, and because authorities in the U.A.E. had stated they would not act on the Jalal matter until their legislative efforts on passage of an asset forfeiture law were complete. (Vaillancourt Aff. ¶¶ 9–11.)

---

**2.** Dubai and Sharjah, where the Defendant Accounts are located, are two of the United Arab Emirates. Abu Dhabi is the capital of the Emirates.

On September 27, 1999 the Senior Legal Advisor at the U.A.E. Ministry of Foreign Affairs informed U.S. authorities that if the U.A.E. were presented with a forfeiture order from an American court, the funds in the Accounts would be forfeited pursuant to the United States' 1995 treaty request. (Vaillancourt Aff. ¶ 12; Ex. F.) He also informed U.S. authorities that the accounts had been frozen by the U.A.E. since May, 1997 as a result of the November, 1995 treaty request. (*Id.*)

This action was commenced on May 21, 2000. On June 28, 2000 the U.S. Department of Justice forwarded certified copies of the Verified Complaint and Warrants for Arrest to the U.S. Embassy in Abu Dhabi. (Vaillancourt Aff. ¶ 13; Ex. G.) On July 1, 2000 the Verified Complaint and Warrants for Arrest were served under Diplomatic Note to the Ministry of Foreign Affairs of the U.A.E. in Abu Dhabi. (Vaillancourt Aff. ¶ 14.)

## II. ANALYSIS

### A. *Jurisdiction In Rem*

As an initial matter, at oral argument this Court *sua sponte* asked the parties to brief whether the Court had *in rem* jurisdiction over the accounts in question. Having reviewed the parties' post argument submissions, for the following reasons the Court is satisfied that it has jurisdiction to consider Claimant's motion in all respects.

28 U.S.C. § 1355(a) provides a district court with original subject matter jurisdiction to hear any forfeiture action that arises under any Act of Congress. Further, 28 U.S.C. §§ 1355(b)(1) & (2) provide that when such a forfeiture action involves property located in a foreign country, venue is proper in any "district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred."

Given those provisions, it is apparent that this Court has subject matter jurisdiction over the Government's forfeiture action, which was brought against the Defendant Accounts pursuant to 21 U.S.C. § 881. Similarly, even though the Accounts are located abroad, because the Accounts were allegedly funded with the proceeds of drug transactions that occurred in New Jersey, venue for the Government's action is proper before this Court.

Just because a district court has subject matter jurisdiction over a forfeiture action and is the proper venue for the commencement of that action, however, does not mean that a Court may reach the action's merits. Absent *in rem* jurisdiction over the Defendant property, any forfeiture order directed to the defendant property would be wholly unenforceable. This state of affairs would defeat the entire purpose of conducting the forfeiture proceeding in the first place.

In an *in rem* action, such as a forfeiture action brought pursuant to 21 U.S.C. § 881, while an "actual and continuous possession of the *res*" is not required to sustain a Court's jurisdiction, a court must have "actual or constructive control of the *res*" at the time the *in rem* forfeiture suit is initiated. *Republic National Bank of Miami v. United States*, 506 U.S. 80, 84–87, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992), *citing The Brig Ann*, 13 U.S. (9 Cranch) 289, 3 L.Ed. 734 (1815). In cases where the *res* consists of property located in a foreign country, a district court obtains constructive control over the property if the foreign state sufficiently cooperates with the United States so as to make it likely that a future forfeiture order against the property would be enforced. *See, e.g., United States v. All Funds in Any Accounts Maintained in the Name of Meza*, 63 F.3d 148, 154 (2d Cir.1995)(constructive control existed after British Gov-

ernment froze funds pursuant to treaty request, and served copies of U.S. court's forfeiture complaint and warrant); *United States v. All Funds in Accounts in Banco Espanol De Credito, Spain,* 141 F.Supp.2d 548 (D.D.C.2001)(constructive control existed after Spanish authorities froze drug proceeds pursuant to U.S. treaty request, and served U.S. arrest warrants).

■   Based on a review of the relevant facts, this Court concludes that the conduct of authorities in the U.A.E. vested the courts of the United States with constructive control over the Defendant Accounts as of September 27, 1999. Accordingly, the Court had *in rem* jurisdiction over the Defendant Accounts when the Government commenced this action on May 21, 2000.

The Court reaches the conclusion that constructive control existed on that date, but not prior to it, because prior to September 27, 1999 there was no indication from anyone in a position of authority in the U.A.E. that a forfeiture order of an American court would be enforced. Specifically, it was only on September 27, 1999 that the Senior Legal Advisor at the U.A.E. Ministry of Foreign Affairs informed U.S. authorities that if the U.A.E. were presented with a forfeiture order from an American court, the funds in the accounts would be forfeited pursuant to the United States' 1995 treaty request. (Vaillancourt Aff. ¶ 12; Ex. F.)

Although the Claimant rightly notes that the Defendant Accounts in the U.A.E. were actually frozen twice in response to U.S. requests (once in or about October 1992, and once in or about May, 1997), neither one of those acts by the U.A.E. gave any indication that the U.A.E. would enforce an American forfeiture order. In fact, although the Accounts were frozen in October, 1992 in response to an informal request by the D.E.A., the accounts were frozen at that time so that their forfeiture to the *U.A.E.* government could be pursued.

While forfeiture legislation was pending in the U.A.E., representatives of the D.E.A. repeatedly met with local authorities in the U.A.E. in an effort to ensure that the funds would ultimately be forfeited. It was only after it became clear to agents of the United States Government that the forfeiture legislation in the U.A.E. was stalled that a subsequent request to forfeit the funds was made pursuant to United Nations Treaty in November, 1995.

The United States had no assurances when it made this multilateral treaty request in 1995 that any forfeiture would occur as a result, for unlike circumstances in *Meza* and *Banco Espanol,* no mutual assistance treaty existed (or exists) with the U.A.E. that would ensure the enforcement of such a forfeiture request. To underscore this uncertainty, in a letter to American officials in the U.A.E., U.S. Department of Justice Special Counsel Juan C. Marrero wrote in 1995 that:

> Our dilemma with respect to the accounts is that we cannot obtain a forfeiture judgment against these funds in New Jersey until we know whether the U.A.E. will either enforce our judgment or repatriate the funds.

(Letter of Special Counsel Juan C. Marrero ("Marrero Letter"), June 30, 1995, Vaillancourt Ex. D, p. 2.)

While the 1995 treaty request did lead directly to the freezing of the funds in May, 1997, it was not until the September 27, 1999 conversation with the representative of the U.A.E. Ministry of Foreign Affairs that the United States had any assurances that a judgment of forfeiture from an American court would be enforced in the U.A.E. For that reason, this Court concludes that it was only after September 27, 1999 that sufficient constructive control over the Defendant Accounts could have

existed to vest a district court with *in rem* jurisdiction over the Defendant Accounts. Given that constructive control, this Court now has *in rem* jurisdiction over the Defendant Accounts.

### B. *Claimant's Statute of Limitations Argument*

Having concluded that it has *in rem* jurisdiction over the Defendant Accounts, the Court now turns its attention to Claimant's motion to dismiss, or in the alternative for summary judgment. Claimant's motion rests primarily on a narrow question: whether the statute of limitations for commencement of a forfeiture action had run prior to the Government's filing of their forfeiture complaint on May 31, 2000.

The parties to this dispute agree that 19 U.S.C. § 1621 is the limitations provision applicable to the Government's action. At the time the action was commenced, § 1621 provided in relevant part that:

No suit or action [for] forfeiture of property accruing under the customs laws shall be instituted unless such suit or action is commenced within five years after the time when the alleged offense was discovered; except that . . .

(2) the time of the absence from the United States of the person subject to the penalty or forfeiture, or of any concealment or absence of the property, shall not be reckoned within the 5 year limitations period.

19 U.S.C. § 1621 (1993). Given the language of the statute, in order to determine whether the applicable five-year limitations period has run, this Court must engage in a two part inquiry. First, the Court must determine at what point the relevant five-year limitations period began to run. Second, the Court must determine whether the Defendant Accounts were at any point either "concealed or absent" so as to toll the running of the limitations period.

#### 1. *"Discovery" of the Alleged Offense*

The Claimant asserts that based on a plain reading of 19 U.S.C. § 1621, "the alleged offense was discovered" on August 19, 1992, the day on which Jalal was arrested and the bank records were found in his home. In the alternative, Claimant contends that the underlying drug offense to which the accounts were linked was discovered no later than June 29, 1993, the day on which Jalal was sentenced. In either event, Claimant contends that the statute of limitations had run on no later than June 29, 1998, or approximately 2 years before this action was commenced.

In response, the Government contends that the alleged offense is not "discovered" until discovery of *the property's connection* to the underlying drug offense (regardless of when the underlying drug offense was discovered), and relies on several cases to support the proposition that in an *in rem* action, the property is the offender. *See, e.g., United States v. Ursery,* 518 U.S. 267, 288, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996); *Bennis v. Michigan,* 516 U.S. 442, 446, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996); *Austin v. United States,* 509 U.S. 602, 615–16, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). Reliant upon this rule, the Government contends that the statute of limitations did not begin to run until November 21, 1995 at the earliest, for it was not until that date that the United States had sufficient probable cause to link the Accounts to Jalal's drug trafficking (it was also on that date that the Government submitted its treaty request to the U.A.E.). As a result, the Government contends that this action was commenced approximately six months prior to the statute of limitations' expiration.

Courts have disagreed as to whether 19 U.S.C. § 1621 begins to run at discovery of the underlying offense that leads to a property's forfeitability, or at discovery of

the property's connection to the underlying offense. A court in this district gave careful treatment to the issue, and concluded that "discovery" occurred when probable cause had been developed to link property to the underlying offense. *United States v. § 116,000 in United States Currency,* 721 F.Supp. 701, 705 (D.N.J. 1989). In that decision the court reasoned that because the Government could not institute a forfeiture action until they had developed probable cause tying property to the underlying offense, if the statute of limitations began to run at discovery of the underlying offense the statute of limitations might expire before sufficient probable cause had been developed to institute a forfeiture proceeding. This, in the court's estimation, would render the forfeiture provisions meaningless, and would be an unacceptable result. In the recent *Banco Espanol* decision the District Court for the District of Columbia reached a similar conclusion, and implied that the clock began to run as of the time when the U.S. had discovered both the claimant's drug offenses and their connection to the Defendant bank accounts. 141 F.Supp.2d at 553.

A recent decision of the United States Court of Appeals for the Eight Circuit, however, calls the preceding rule into doubt. In *United States v. Twenty–Seven Parcels of Real Property Located in Sikeston, Scott County, Missouri,* 236 F.3d 438 (8th Cir.2001), the Eight Circuit, after examining assorted cases and the legislative history of the 2000 Amendments to 19 U.S.C. § 1621 expressly concluded that:

the timeliness of [a] forfeiture action, commenced under the prior version of the statute,[3] is therefore to be measured from the date the government discovered the underlying criminal offense, not the date it discovered the property's alleged connection to that offense.

236 F.3d at 440. Quite obviously, the Eighth Circuit's conclusion strongly undercuts the Government's argument in this case.

■ Absent binding Third Circuit precedent on this issue, the Court declines to affirmatively embrace either rule, for given the facts of this case the Court concludes that it is irrelevant which rule applies. Even if the Government is correct that the statute of limitations did not begin to run until probable cause linking the property to the offense was developed, the Court has evidence before it that such probable cause existed more than five years prior to the institution of this action.

The Court reaches this conclusion because of two statements made in government exhibits. On January 17, 1995, a D.E.A. Telex stated that:

a letter has been drafted by the DOJ office of asset forfeiture to U.A.E. Deputy Attorney General Mr. Rehim. The letter offers ... all the available evidence to support seizure should the U.A.E. desire to wait and take unilateral action once proper legislation is in place.

(Vaillancourt Ex. C, ¶ 8.) Also, on June 30, 1995 the Marrero Letter indicated that on December 12, 1994 U.S. officials had met with U.A.E. authorities to discuss the Defendant Accounts, and had informed the U.A.E. that the U.S. was in a position to "immediately" submit a letter rogatory request for the repatriation of the funds to the United States. (Marrero Letter P. 1, Vaillancourt Ex. D.) The letter makes no mention of the investigation being on-going, or of any need to gather additional information to support the letter rogatory request.

Although the Government did not submit its treaty request to the U.A.E. until

---

**3.** The version as amended in 1993, i.e. the same version that applies to this case, the Government's action having been commenced prior to the 2000 amendment.

November 21, 1995, based on the aforementioned exhibits the Court concludes that the Government likely had probable cause to support the treaty request almost a year earlier. This probable cause was apparently developed prior to May 21, 1995, the critical date for limitations purposes. Given that finding, unless the running of the statute of limitations was tolled for some period, the Claimant would be entitled to the relief he now requests.

### 2. *19 U.S.C. § 1621's Tolling Provision*

19 U.S.C. § 1621 provides that "the time of the absence from the United States of the person subject to the penalty or forfeiture, or of any concealment or absence of the property, shall not be reckoned within the 5–year limitations period." The Government contends that the plain language of the statute must be given effect, and argues that the plain language explicitly dictates a tolling of the limitations period in this case. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 5–7, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000)(when a statute's language is plain, the sole function of the courts is to enforce it according to its terms). Specifically, because the Defendant Accounts are absent from the United States, the Government contends they are "absent" for purposes of the statute.

In the alternative, the Government asserts that at the very least the funds should be considered to have been "absent" until they fell under this Court's constructive control. Claimant responds that tolling doctrines should be narrowly construed against the Government, and that both logic and the relevant case law cut against tolling the limitations period in this case. Claimant reads the tolling provision to only apply to those cases where the Claimant has intentionally hidden his property from the authorities, not merely moved it abroad.

As an initial matter, the Court notes the paucity of case law in this area. By the Court's estimation, only two reported decisions address either the meaning or application of 19 U.S.C. § 1621's "absence" provision for persons or property located abroad, *See Banco Espanol*, 141 F.Supp.2d at 553–54; *United States v. Islip*, 18 F.Supp.2d. 1047, 1068–69 (CIT 1998), and only the *Banco Espanol* decision deals with forfeiture of drug proceeds located in accounts abroad.

In *Islip*, the Court of International Trade concluded that a defendant Canadian citizen who had never been in the United States was not "absent" for purposes of § 1621, because the dictionary definition of absence required being "away from one's domicile, or usual place of residence." 18 F.Supp.2d at 1069. Given that a mutual assistance treaty with Canada had ensured both Canada and defendant's full cooperation throughout the proceedings, the court concluded that it would be inappropriate to indefinitely toll the limitations provision just because defendant permanently resided abroad. *Id.* The court reached its decision in part because Defendant was "not a fugitive who fled the United States to conceal himself and avoid suit." *Id.*

In *Banco Espanol*, the District Court for the District of Columbia was asked to determine whether a number of bank accounts located in Spain, which were known to the Government, were "concealed" and/or "absent" for purposes of tolling 19 U.S.C. § 1621. 141 F.Supp.2d at 552–54. The court concluded that the use of fictitious names on the accounts in question had sufficiently concealed them so as to avoid detection by law enforcement. This tolled § 1621 until at least their discovery by law enforcement, regardless of when the illicit accounts had been established. Once U.S. law enforcement became aware of the accounts' existence, however, the

"concealed" tolling provision was no longer applicable. *Id.*

The court in *Banco Espanol* went on to determine that the "absence" provision operated separately from the "concealed" provision. *Id.* at 553–54. The court concluded that because the accounts had remained at all times in Spain and "outside the constructive control of the United States" until a mutual assistance treaty had made forfeiture possible, the funds were "absent" for purposes of 19 U.S.C. § 1621. *Id.* In reaching this conclusion the court distinguished *Islip,* on the grounds that, unlike the Defendant in *Islip,* the defendant *funds* in the *Banco Espanol* case had once been U.S. Dollars, which had been "absented" from the United States.

■ After consideration of the issue, this Court now concludes that 19 U.S.C. § 1621's tolling provision does apply to this case. It is the conclusion of this Court that when forfeitable property[4] is sheltered abroad beyond an American court's constructive control, it is "absent" for purposes of 19 U.S.C. § 1621's tolling provision for the entirety of the time it remains beyond the Court's constructive control. More simply: "absent" property is any property beyond the Court's control.

Any contrary rule would make it far too easy for a criminal to launder financial proceeds abroad. An unsavory character could place ill-gotten funds in a bank account in any nation that refuses to cooperate with the United States, and put the United States Government on notice of the property's location and illegal nature.

Having "discovered" the alleged offense the Government's limitations period would begin to run. After five years the funds would become untouchable, even though the United States never had an opportunity to seek their forfeiture. The criminal could then do with the funds as he pleased, which would clearly be an unacceptable result.

The aforementioned unacceptable result would also run contrary to a congressional statement that appears in the legislative history of 19 U.S.C. § 1921's limitations provision. A tolling provision for forfeiture actions seemingly appears for the first time in Section 22 of Chapter 391 of an Act of June 22, 1974, which held:

> That no suit or action to recover any pecuniary penalty of forfeiture of property accruing under the customs revenue laws of the United States shall be instituted unless such suit of action shall be commenced within three years after the time when such penalty of forfeiture shall have accrued; Provided, that the time of the absence from the United States of the person subject to such penalty or forfeiture, or any concealment or absence of the property, shall not be reckoned within this period of limitations.

18 Stat. 190 (GPO 1875). To the best of the Court's knowledge, while no similar provision existed prior to 1875, the "absence" tolling provisions embodied above subsequently evolved into today's 19 U.S.C. § 1621.

---

**4.** Whether the forfeitable property originated in the United States or was always located abroad is irrelevant to this Court. Although such a conclusion runs contrary to the express holding of *Islip,* this Court agrees with the *Banco Espanol* court that the *Islip* court's interpretation of absence is "dubious." 141 F.Supp.2d at 554. Given that conclusion,

however, this Court's interpretation of § 1621's absence provision would not have mandated a different result in *Islip,* for in that case Canadian governmental cooperation had placed the defendant under the court's constructive control. That constructive control would have kept the defendant from being "absent."

It appears that the 1875 limitations provision may have begun its life as a proposed amendment which read:

> That no suit or action to recover any pecuniary penalty of forfeiture of property accruing under the customs revenue laws of the United States shall be maintained unless such suit or action shall be commenced within two years after the time when such penalty or forfeiture shall have accrued: *Provided that the person or property liable for such penalty or forfeiture shall, within the same period, be within the United States so that the proper process may be instituted and served against such person or property therefor.*

(*Evidence Before the Committee on Ways & Means Relative to Moieties and Customs Revenue Laws,* p. 16 (Washington GPO 1874)(May 2, 1874 to accompany bill H.R. 3171)(emphasis added).) Although the Court is not certain that the foregoing amendment was eventually enacted as the Act of 1875, given the preceding language the Court concludes that the "concealment" and "absence" provisions of § 1621 may well have had their roots in concerns that the limitations period for forfeitures not run during any period when property is beyond the reach of the court.

■ Given all of the foregoing considerations and the absence of any precedent to the contrary, this Court concludes that the five-year limitations provision in 19 U.S.C. § 1621 was properly tolled in this case until September 27, 1999, the date upon which the United States received notice that authorities in the U.A.E. would lend effect to any judgments of forfeiture. Because the Court could not have obtained constructive control over the Defendant Accounts prior to that date, they were necessarily "absent" until September 27, 1999 for purposes of 19 U.S.C. § 1621. Inasmuch as the five-year statute of limitations did not begin to run until that date,

the Government's commencement of this action on May 21, 2000 (approximately eight months later) was timely.

## C. Claimant's "Due Process" Argument

As a final matter, Claimant contends that the near eight year delay between his arrest in 1992 and the commencement of forfeiture proceedings in 2000 has deprived him of his constitutional right to due process of law. The Court disagrees, for the following reasons.

■ A due process violation can result if a dispossessed property owner has been deprived of a "meaningful hearing at a meaningful time." *United States v. $8,850.00 in United States Currency,* 461 U.S. 555, 563, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983). This is because a claimant whose property was seized has been entirely deprived of the use of the property. *Id.,* at 564, 103 S.Ct. 2005. In determining whether a delay in instituting a forfeiture proceeding constituted a violation of due process, the overarching factor is the length of the delay. *Id.,* at 565, 103 S.Ct. 2005. The other factors for a court to consider are 1) the reason for delay; 2) a claimant's assertion of the right to a judicial hearing; and 3) whether the claimant has been prejudiced by the delay. *Id.,* at 567–69, 103 S.Ct. 2005.

■ First and foremost, the Court finds that the length of delay attributable to the government is *not* seven years and eleven months, as the Claimant suggests. Bearing in mind that the right in question is to a "meaningful hearing at a meaningful time," no court in the United States would have been of competent jurisdiction to hear an *in rem* action against the Defendant Accounts until September 27, 1999, when the U.A.E. finally agreed to enforce an American forfeiture order. Accordingly, for purposes of Claimant's mo-

tion this Court must consider whether the eight month delay from September, 1999 to May, 2000 violated Claimant's due process rights.[5]

Regarding the reason for the delay, the Court finds that all of the delay in this case is directly and completely attributable to Claimant's decision to move these proceeds from the United States to the United Arab Emirates. Had the funds been located in the United States, the Court is certain the United States would have moved to forfeit them in an expeditious manner. As it was, the record demonstrates that representatives of the United States Government regularly attempted to secure forfeiture of the funds in the U.A.E., but were unable to do so. After the funds became procedurally forfeitable in the United States, the United States moved in a reasonable manner to forfeit them.

In regards to the Claimant's assertion of his right to a hearing and the prejudice suffered by not receiving one until May, 2000, the Court notes that in November, 1992 as a part of its on-going investigation the Government asked Jalal to substantiate a legitimate source for the funds in Dubai. (Vaillancourt Aff. ¶ 3, Ex. B ¶ 10.) Although he made the unsupported assertion that the funds were the legitimate proceeds of gold trading, he indicated that he was not sure he could produce any documents to substantiate his claims. (*Id.*)

In early 1995, apparently for the first (and only) time, the D.E.A. received a telephone call from Jalal's attorney requesting access to the funds. (Complaint

¶ 21.) The D.E.A. informed Claimant that he would have to provide substantiation as to the funds' legitimacy before the D.E.A. could seek their return. No effort at substantiation was made by the Claimant. To the best of the Court's knowledge, the one phone call in 1995 represents the entirety of Claimant's assertion of his right to the property between his arrest in 1992 and the institution of this forfeiture proceeding in 2000.

The Court finds the foregoing facts to be evidence of Claimant's acquiescence to a delay in having a judicial hearing, *see United States v. $19,440 in U.S. Currency*, 829 F.Supp. 303, 308 (D.Alaska 1993)(finding two-and-a-half-year silence after letter request for return of property to evidence acquiescence), and further evidence of the absence of prejudice to the Claimant as a result of any delay attributable to the Government. As the Supreme Court noted in *$8,850 in U.S. Currency*, "the primary inquiry here is whether the delay has hampered the claimant in presenting a defense on the merits, through for example, the loss of witnesses or other important evidence." 461 U.S. at 559, 103 S.Ct. 2005. Because the Defendant was unable to provide evidence to the government in substantiation of the legitimacy of the funds in 1992 (three months after his arrest) and was again unable to do so in 1995, the Court fails to see how he is now worse off, absent specific claims that once-available evidence has now disappeared.

Given that none of the *$8,850* factors weight in favor of granting Claimant relief, this Court concludes that any prejudice to Claimant that might have resulted from

---

**5.** It is also important to note that prior to the service of the Court's warrant of arrest in June, 2000, the accounts had at all times been frozen by unilateral act of the U.A.E., and not by an act of the United States Government. Even the decision to freeze the funds in 1997 pursuant to the U.S. treaty request was unilat-eral, as the U.A.E. had no binding treaty obligation to assist the United States. Had Claimant wished to secure the release of his funds during that period he would necessarily have had to seek their release in the U.A.E. There is no evidence in the record that Claimant ever made such a request.

the delay in this matter does not rise to the level of a due process violation. Accordingly, given that the Government's filing of this action was timely, Claimant's motion to dismiss and in the alternative for summary judgment is hereby **denied.**

## III. CONCLUSION

For the foregoing reasons, Claimant's motion to dismiss, and in the alternative for summary judgment, is hereby **denied.** Further, Claimant's motion for a protective order staying discovery pending resolution of the motion to dismiss is dismissed as **moot.**